THOMAS EVANS v. THE LAKE SHORE & MICHIGAN
SOUTHERN RAILROAD COMPANY AND THE DETROIT,
GRAND HAVEN & MILWAUKEE RAILWAY
COMPANY.

*Railroad companies—Absence of gate-man from place of duty—
Contributory negligence.*

1. This case comes clearly within the principles laid down in *Richmond v. Railway Co.*, 87 Mich. 374, and should have been submitted to the jury.

2. When gates are provided by railroad companies at street crossings, the public have a right, the gates being open, to presume, in the absence of knowledge to the contrary, that the gatemen are properly discharging their duties, and are not negligent in acting upon the presumption that they are not exposed to a danger which could only arise from a disregard of such duties.

3. Plaintiff, a street-car driver, who was injured at a railroad crossing, testified that he was signaled to "come on" by one whom he supposed to be the gate-keeper, but who was not a servant of the railroad company, and who denied giving such signal, and testified that he warned plaintiff not to attempt to make the crossing. The gate was open at the time, and the gate-keeper was temporarily absent for the purpose of attending a switch near by. And it is held that the conduct of the stranger, as found by the jury from the conflicting testimony, was proper to be considered by them as bearing upon plaintiff's contributory negligence; that an open gate would not excuse plaintiff's advance upon the crossing in the face of a signal of danger or the protests of a by-stander; and that an assurance of safety, although given by a stranger, would be entitled to consideration and weight in explanation of the conduct of one to whom such assurance was given.

Error to Wayne. (Brevoort, J.) Argued October 14, 1891. Decided November 20, 1891.

Negligence case. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Corliss, Andrus & Leete,* for appellant, contented:

1. If a servant requests another person to do his duty, or assist, him therein, the master is liable for any injury resulting from such person's acts; citing Wood, Mast. & Serv. § 308; *Althorf v. Wolfe,* 22 N. Y. 355; *Simons v. Monier,* 29 Barb. 419;. *James v. Muehlebach,* 34 Mo. App. 512.

2. The absence of the gate-man was gross negligence on the part of defendant; citing *Railroad Co. v. Dunn,* 78 Ill. 197; and where parties approaching the crossing exercise due care, the company is liable for any injury arising from the negligence of the gate-man; citing *Dolan v. Canal Co.,* 71 N. Y. 285; *Kissenger v. Railroad Co.,* 56 Id. 538.

3. The case of *Richmond v. Railway Co.,* 87 Mich. 374, conclusively establishes the right of plaintiff to have the facts submitted to the jury.

*A. C. Angell,* for defendant Lake Shore & Michigan Southern Railroad Company, contended:

1. If the plaintiff was guilty of contributory negligence, the action of the court was not erroneous; citing *Eakins v. White Bronze Co.,* 75 Mich. 568.

2. There is no evidence that Hurley was defendants' servant:

  *a*—Dilworth was a servant of subordinate character, and had no authority to employ Hurley, and no one else employed him. He owed no duty to the defendants, nor had they any control of him. A master is not liable, as for a servant's act,. for the conduct of one whom he has not employed, or to whose employment he has not consented; citing *Mangan v. Foley,* 33 Mo. App. 250; *Jewell v. Railway Co.,* 55 N. H. 84.

  *b*—Hurley was in no sense a servant unless he did what he did because some one representing the defendants asked him to do it. His own testimony is clear that he did not hear Dilworth ask him to stop the car; that he acted as a volunteer. The cases first cited by plaintiff's counsel are not in point. *Althorf v. Wolfe,* 22 N. Y. 355, was a case where the assistant was working with the servant at his request, and doing exactly the same thing, and *Simons v. Monier,* 29 Barb. 419, was one where a servant, instead of setting fire to some brush, directed his son to do that precise act; and in *James v. Muehlebach,* 34 Mo. App. 512, the very point insisted on by us is. emphasised, the master being held not liable for the act of the servant's assistant, unless the assistance was rendered merely by reason of the servant's wish and desire.

  *c*—Even if Dilworth had authority to employ Hurley to stop.

the car,—that is, to do his duty,—and if Hurley had gone because of Dilworth's request, still, on the plaintiff's testimony, Hurley deliberately endeavored not to stop, but to hasten, the car. Upon no theory can he be held a servant for that purpose. The liability of the master for the disobedient conduct of a servant he has selected can hardly be stretched to cover this case.

3. Again, if Hurley were on any theory defendant's servant, his conduct cannot justify plaintiff's needless recklessness in approaching the gate as he did. The statute of 1889 (3 How. Stat. § 3565c), the rules of the street-car company, the city ordinance, and common experience all required that, whatever signal was given him, plaintiff should, when he could do so with perfect ease and security, have approached the gate under such control that he could be governed by what his senses would have then disclosed to him. His duty to his passengers, if not to himself, demanded this.

*L. C. Stanley*, for defendant Detroit, Grand Haven & Milwaukee Railway Company.

McGRATH, J. This is an action on the case for negligence.

Defendants' road crosses Croghan street about 300 feet east of Orleans street, in the city of Detroit, at grade. The southerly side of the street, west of the track, is occupied by frame dwelling-houses, two stories high, built close together, and flush with the southerly line of Croghan street; and the most easterly house is about 40 feet from the westerly track. Cars going north on defendants' track climb a heavy grade. A gate-keeper and drop-gate are maintained by defendants at the crossing. A street railway is operated on Croghan street. Plaintiff claimed that, while driving easterly upon one of the street-cars, he stopped his car at Orleans street, to allow a passenger to alight; that in approaching the crossing the street-car conductor usually jumped off, and ran forward to the crossing, and signaled him whether to come on or stop; that in this instance the conductor went forward as usual, and plaintiff turned on the brake to check his car,

so as to give the conductor time to report; that, as he did so, one Hurley, who was at the gate, and whom plaintiff supposed to be the gate-man, beckoned him to come on, and he turned off the brake, and started forward; that it was quite usual for the gate-keeper to signal him as he approached the crossing; that he could not see any distance south of Croghan on defendants' tracks until his horses had passed the last dwelling on the south side of the street; that the grade of the street at the tracks is considerably lower than it is 40 feet west of the crossing; that, as he approached the crossing, Hurley called out to him to hurry up, and he started up his horses; that he had no knowledge or warning of the approach of cars until the heads of his horses were within a few feet of the tracks; that when he discovered the train he was too late to stop his car, and the only course open was to get across before the engine; that, as he attempted this, a locomotive with tender attached, going north, tender first, struck the rear part of his car, killing one passenger, injuring others, and seriously injuring plaintiff; that the engine was running at a rate of speed prohibited by the city ordinances; that the gate was open at the crossing, and no whistle or bell was sounded.

Defendants claimed that the whistle was blown, and that the locomotive had a steam bell attached; that Hurley was not the gate-man or their agent; that the gate-man and Hurley were together in the gate-keeper's shanty when the engineer of the approaching locomotive whistled for a switch, which was north of and near the crossing; that the gate-man and Hurley then came out of the shanty, the former going to open the switch, and the latter going to the locality of the drop-gate. The gate-man says that he told Hurley to attend the gate or look out for the street-cars; but Hurley says that he received no instructions from the gate-man, denies that he signaled the plaintiff

to come on, and claims that he would have dropped the gate, but did not do so because the horses were in the way when he thought of it. The gate stood 38 feet west of the tracks.

The court submitted the case to the jury, but after the jury had retired, and it became evident that they could not agree, the jury were recalled, and directed by the court, upon its own motion, to bring in a verdict for defendants.

The court erred in directing a verdict. The case comes clearly within the principles laid down in *Richmond v. Railway Co.*, 87 Mich. 374. In that case there was no gate, but there was a flagman, whose duty it was to notify the public of approaching trains. He was in the shanty, and ran out too late to avert the collision. It was shown that he could be seen sitting in the shanty from the street-car. In the present case there was a gate, which was open, and thereat a person, who not only did not close it, but who, it is claimed, signaled the plaintiff to come on; in other words, assured him that it was safe to cross the railroad tracks. The testimony tended to show that the gate-man had up to this time been present at his post, and that usually, when trains were approaching, the gate was closed, or dropped across the street-car tracks. The gate-keeper was clearly negligent in leaving his post, knowing that the engine was approaching the crossing, without closing the gate, or giving some signal of danger. It has been frequently held that when gates are provided the public have a right, the gates being open, to presume, in the absence of knowledge to the contrary, that the gate-men were properly discharging their duties, and that it was not negligence on their part to act on the presumption that they were not exposed to a danger which could only arise from a disregard of their duties by the gate-men. *Glushing v. Sharp*, 96 N. Y. 676; *Railway Co. v.*

*Schneider*, 45 Ohio St. 678 (17 N. E. Rep. 321). It is urged that gate-men cannot be present at all times; but the gate is always present, and, when open, it tends to assure the public of the absence of danger. Railroad companies can protect themselves and the public by closing the gate in the temporary absence of the gate-man.

In the present case it is urged that Hurley was not a servant of the defendants, and hence defendants are not responsible for his act in assuring plaintiff that it was safe to cross. Conceding that Hurley was not the servant of the company, and was a mere by-stander, his conduct bears upon the question of the contributory negligence of the plaintiff. It is one of the circumstances properly to be considered by the jury in determining that question. If, as he claims, he did not signal plaintiff to come on, but did signal him to stop, the jury would be entitled to consider that fact in determining the question of plaintiff's negligence, and its weight would not be materially affected by the fact that he was not the servant of the company. Hurley occupied the place usually occupied by the gate-man. His presence there, the plaintiff's belief that he was the gate-man, his conduct there, and the open gate, are all circumstances to be considered by the jury in determining the question of plaintiff's negligence. An open gate would not excuse plaintiff's advance upon the crossing in the face of a signal of danger, or the protests of a by-stander; and an assurance of safety, although given by a stranger, is entitled to consideration and weight in explanation of the conduct of one to whom the assurance is given.

It is insisted that the testimony tends to show that the rules of the street-car company provided that, before attempting to cross the tracks, the driver should stop the car, and wait until the conductor should go ahead and see that it was safe to cross; that the driver did not

observe this rule, and was therefore guilty of negligence, and cannot recover. A careful examination of this testimony, and a fair construction of it, will not disclose the existence of such a rule, or testimony tending to establish its existence. The company's orders undoubtedly were, if the gates were up, and no gate-man was present, that the driver should stop, and the conductor should first see that it was safe to cross; but, if the gate was not closed, and the gate-man was present and signaled them to come on, such signal was to be considered as an assurance of safety, and they were to go on. This was the testimony of the plaintiff, the conductor, and of other witnesses. Upon this point it is only necessary to quote an extract from the testimony of G. S. Hazard, the superintendent of the street railway company, who says:

"The order of my company was for the men to see that the way was clear before they crossed. That was the written order they had; so that, whenever the gate-man gave them the right of way, by either telling them or directing them to proceed, it was our instructions to rely upon his order. The instructions were, if the man at the gate waved them to come on, to go on. At that time there were no instructions to get down to run ahead; but the instructions were to see that the way was clear, and, if he waved them on, to go on. We do not now depend upon anybody but ourselves. Everybody runs ahead. But at that time we were relying upon the railroad. * * * We depended upon the day watchman for safety."

It is urged that the man at the gate told the driver to "hurry up," and that that of itself was a warning; but this was after the gate-man had beckoned the driver to come on, after the driver had started up the horses, after he had reached the line of defendants' right of way, on a down grade, and before either driver or conductor had seen the engine approaching. It cannot be presumed that

the driver was possessed of the same knowledge as was possessed by the gate-man. In determining the question of plaintiff's negligence, all the circumstances must be considered. The facts disclosed by this record respecting plaintiff's conduct were not such as to warrant the court in determining as a matter of law that plaintiff was guilty of contributory negligence. That matter should have been submitted to the jury.

Respecting defendants' negligence, the act which induced plaintiff to approach the crossing without the usual precautions was not necessary to sustain the charge. Their negligence was established by the showing as to what they failed to do. If they failed to close the gate, and to warn plaintiff of the danger, a case was made out, and plaintiff was entitled to recover, unless plaintiff was shown to have been negligent. If plaintiff was warned not to approach the crossing, and the warning was of such a nature that an ordinarily watchful and prudent person could have seen and understood it, and plaintiff did not heed it, but drove upon the tracks in the face of it, he was guilty of contributory negligence, and cannot recover. If, however, the plaintiff was assured by a signal from any person, whether he was a servant of defendants or a stranger, that it was safe to cross, that circumstance is entitled to be considered by the jury as excusing his failure to observe the precautions ordinarily taken, especially as the person giving the signal occupied the place usually occupied by the gate-keeper, and plaintiff believed him to be the gate-keeper.

In view of what has been already said, it is unnecessary to discuss the instructions given to the jury before they were recalled.

The judgment is reversed, and a new trial ordered, with costs.

Morse and Long, JJ., concurred with McGrath, J. Champlin, C. J., concurred in the result.

Grant, J. *(dissenting)*. I cannot concur in the conclusion reached by my brethren. The following facts are established by the plaintiff's case:

1. Plaintiff was familiar with the crossing, and had for some time crossed it 16 times a day. Thirty-eight regular trains passed each day, besides switch trains. He knew that one was liable to come at any moment; that there was a slight descent between the gate and the track; and that the street railway track was wet, thus rendering it more difficult to stop the car.

2. On reaching a point 41 feet from the track he could see the engine 700 feet away.

3. He approached this point at a high rate of speed.

4. The rules of the street-railway company, in whose employ plaintiff was, required their employés to see that the way was clear before they crossed. It appears that written instructions were given, but these were not produced. The conductor, who was with the plaintiff at the time of the accident, says: "The orders were, when we came to that crossing to have the cars slack down, and the conductor run ahead, and see if the way was clear." It is to be regretted that these instructions, being in writing, were not produced, so as to remove all doubt as to what they were. Mr. Hazard, the superintendent of the street-railway company, testified upon this point as follows:

"The order of my company was for the men to see that the way was clear before they crossed. That was the written order they had; so that, whenever the gateman gave them the the right of way, by either telling them or directing them to proceed, it was our instructions to rely upon his order. The instructions were, *if*

the man at the gate waved them to come on, to go on. At that time there were no instructions to get down and run ahead; but the instructions were to see that the way was clear, and, if he waved them on, to go on. We do not now depend upon anybody but ourselves. Everybody runs ahead."

On cross-examination he testified as follows:

"There was a written order on the time-table; a time-table put up; and there was an order saying, if the way was clear before attempting to cross— That is, the order that was on the time-table; also on the time-table that was written. There were sometimes—not then, before that time—there were times that there was no watchman there at all, and during the day sometimes a watchman had to step out for something, and we see the order was given in case they did not see him there, or he was not there and waved them on, it was the order to see that the way was clear before attempting to cross; that is what was meant. The matter of the watchman beckoning came up. Probably some of the men asked me in case he motioned ahead to go ahead, and I told them, 'Why, yes.'"

He further testified that he did not remember of having said to Mr. Evans to go ahead if the watchman beckoned, nor could he remember any particular one to whom he made such statement. He says: "I know some of them have spoken to me about it. I know I have said so to some of them." It is very significant, as bearing upon the question of these instructions and the conduct of the plaintiff, that the conductor on this occasion jumped from the car at the usual place for the purpose of running ahead and ascertaining if the track was clear; but the horses were going nearly as fast as he could run. He succeeded in getting nearly abreast of the horses' heads, when he saw the engine approaching, and hallooed to the driver to stop. The testimony of Mr. Hazard, above quoted, is very indefinite. It is very difficult to determine from it just what he means. It is certain, however, from his testimony, that there was imminent

danger in crossing this place, and that special instructions were given to their employés for the purpose of avoiding it. Under his own testimony, how could the conductor and driver see if the way was clear before they crossed, except by going sufficiently near the track and looking? Plaintiff says that he received instructions in regard to this crossing from his employer, but does not state what those instructions were.

5. The gates were up, and the gate-man, plaintiff knew, was not there.

6. The accident would have been avoided if the plaintiff had approached the crossing with his horses upon a walk.

7. The only excuse given by plaintiff for not approaching this dangerous place with his horses under control is that Hurley, who did not represent either of the defendants, and was not in their employ, motioned to him to go ahead, and hallooed to him to hurry up. Plaintiff testifies that, if a stranger had waved to him, and said, "Hurry up," he would have gone across without stopping or looking. This is precisely what he did do in this case. It is difficult to imagine a case where common prudence required greater care of a street-car driver than in the present one. He had no right to rely upon the signal from a stranger, and if it be a fact that this stranger called him to hurry up, and stood at the gate motioning him forward, this of itself was a warning that there was danger approaching. The safety and lives of passengers were under his control in approaching this most dangerous place, and a proper regard for the safety of his passengers and of himself required him to approach this crossing with his horses under control. I think the plaintiff was not only guilty of negligence, but that his negligence approached to recklessness. In my judgment, a common and proper regard for the safety of those

traveling upon street railways or in the street-cars repudiates a rule which sanctions such blind reliance as plaintiff displayed in this case, and permits him to rush into danger without any actual knowledge of the situation, which he might easily and readily have obtained, and thus avoided the accident. I do not think this case comes within the rule of *Richmond v. Railway Co.* There the driver was approaching the crossing upon a walk.

Judgment should be affirmed.