BALTIMORE & O. R. CO. v. CONNELL.

(Circuit Court of Appeals, Third Circuit. May 8, 1905.)

No. 23.

1. RAILROADS — CROSSING ACCIDENT — CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY.

In an action for the death of plaintiff's husband by being struck by defendant's railroad train at a crossing, evidence *held* to require submission of deceased's contributory negligence to the jury.

2. SAME—SPEED—EXPERTS—EVIDENCE.

In an action for the death of plaintiff's intestate at a railroad crossing, a conductor, who had been in defendant's service for a long time, and was familiar with the locality at the place where the accident occurred, was competent to testify as an expert as to the rate of speed at which the locomotive would have to go in order to haul the train across the street in question, and into the yard of defendant's railroad.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

John S. Wentz, for plaintiff in error.

F. H. Guffey and Lee C. Beatty, for defendant in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge. This was an action brought by Mary L. Connell against the Baltimore & Ohio Railroad Company to recover damages for the negligent killing of her husband, James Connell, on March 10, 1904, at about 6:40 o'clock a. m., at Marion Junction Cut-Off, which crosses Second avenue in the city of Pittsburg. The main line of the Baltimore & Ohio Railroad in the city of Pittsburg runs in a general way parallel with Second ave-

nue, a highway of the city. In the locality where the accident in question occurred the main tracks of the railroad and Second avenue run east and west in parallel lines. The distance between the south rail of the east-bound track (the south track) and the north curb line of Second avenue is 40 feet. Second avenue, including the sidewalk, is 48 feet wide. There is only one sidewalk, and it is along the south side of the avenue, and is 12 feet wide. At Marion Junction there is a branch of the railroad running from the main line and crossing Second avenue at grade, and extending therefrom into the switching yard. The branch begins to leave the main line about 250 feet westwardly from the place of the accident, and crosses Second avenue at an angle of about 30°. The distance from the point where Connell was struck to the junction of the branch track with the main track, measuring along the branch track, is from 250 to 270 feet. There are some houses between Second avenue and the main line at a distance of 650 feet west of the point of the accident, which obstruct the view of an approaching train coming east along the main track. All passenger trains and many freight trains run over the main track of the railroad, not using the Marion Junction branch. On each side of the crossing the railroad company had erected, and for a number of years had used, safety gates extending, when lowered, entirely across Second avenue and at right angles therewith. These safety gates are lowered and raised together by an interlocking system worked from the signal tower at Marion Junction. The safety gates on the west side of the crossing, measuring along the south line of the sidewalk, are 105 feet from the crossing, and measuring along the north curb line of the avenue are about 29 feet from the crossing. The safety gates on the east side of the crossing, measuring along the south line of the sidewalk, are 18 feet from the crossing. The foregoing statement is applicable to the situation at the time of the accident.

James Connell, on his way from his house, which was westwardly of the railroad crossing, to his work at Hazelwood, which is east of the crossing, was walking eastwardly on the sidewalk of Second avenue. The safety gates on both side of the crossing were standing up. Upon his stepping on the crossing he was immediately struck and killed by the tender of a locomotive which was running backwards and was hauling a train of freight cars over the crossing into the switching yard. This freight train, which consisted of 20 loaded cars and 33 empties, had come from the west over the east-bound main track to Marion Junction, where it turned into the branch track. The witnesses differ as to the speed of the train, but there was evidence on the part of the plaintiff tending to show that it ran into the branch track and over the crossing at the rate of 20 miles an hour. If the train was running at that speed, it was going at the rate of 29 feet per second, and, assuming the distance from the point where Connell was struck to the junction to be 250 feet, it was about 8½ seconds from the time the train turned into the branch railroad until he was struck. There was conflict of evidence as to whether or not the bell was rung or

the whistle was blown for the crossing.. Witnesses for the plaintiff testified that the bell was not rung and that the whistle was not blown. Anderson, who was the railroad company's tower man at Marion Junction before and at the time of the accident, testified as follows:

"Q. How are the safety gates worked? A. They are operated by levers, the same as the switches.· Q. Now, suppose that you got a call for a block from a train that wished to go into the Glenwood yards, and you knew it was all right to let them in, then what would you do? A. I would put down the gates the first thing, and lock the switches, throw down the gates—the safety gates—and then throw the main line signal to red for danger, and then throw to switch leading onto the junction, and then throw the lock on this switch, and then throw the lower block white. Q. Then the train could come on? A. The train can come on a clear track. Q. Could you throw the switch or give the block until you put the gate down? A. No, sir. Q. State if the safety gates were out of order that particular morning? A. They were. Q. And state if they were standing up? A. Yes, sir; they were standing up. Q. Did you have them disconnected from the switching apparatus? A. They were disconnected from the levers—the levers were thrown back. Q. What was the matter with the safety gates? A. They were frozen up at this time. Q. Was there a watchman there to take the place of the safety gates? A. Yes, sir. Q. Who was the watchman? A. Anthony Gawhan. Q. Where was he at the time that this train came over the crossing? A. He was at the tower at this time. Q. Where was he? A. He was lying in the tower asleep, on the floor, at this time."

It appeared by the evidence that the safety gates had been out of working order and disconnected from the levers for several days, but there was nothing in the evidence tending to show that Connell knew the safety gates were out of order, or that they were not working. ·

The plaintiff's witness McLaughlin testified that he was walking westwardly on the sidewalk of Second avenue, and had passed over the crossing, and that between the crossing and the safety gates on the west side, which were then standing up, and when he had got within a few feet of these gates, he met Connell, who was walking toward Hazelwood, and that when he (the witness) had gone past the west side safety gates, and when not very far therefrom, he first saw the train, which was then on the main east-bound track, and was just coming around the block of houses which stood between the main line and Second avenue, 650 feet west of the place of the accident.

There was testimony to show that after the head of the train had got past the block of houses a person walking on the sidewalk eastwardly toward the crossing, as Connell was, would have to turn almost directly around to see the train, and, furthermore, that when he saw it he could not tell that it was coming over the crossing until it turned into the branch road at the junction. The following testimony of the defendant's witness Cooper relates to the knowledge such pedestrian would acquire if he looked back when 30 or 40 feet eastwardly of the west side safety gates:

"Q. Now, suppose a man would look here—say 30 or 40 feet from the safety gates—he would hear a train coming, and that train would be coming along there, would there be anything to indicate to him whether that train was coming across or going up the main track? A. Unless he looked at the signal. Q. He would have to understand the signal? A. Yes."

The signal here meant is the semaphore near the junction tower.

The witness McLaughlin testified that at this time and place other persons besides himself and Connell were walking along the sidewalk in both directions.

The railroad company, the plaintiff in error, asked the court below to give the jury binding instructions in its favor on the ground that Connell was guilty of contributory negligence, but the court refused such instructions and left the question of contributory negligence to the jury. The refusal of the court to direct a verdict for the railroad company is the principal matter complained of by the plaintiff in error. We proceed then to consider whether this complaint is well founded.

Now, in Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 683, 36 L. Ed. 485, the Supreme Court, after remarking that there is no fixed standard in the law by which the court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent and what shall constitute ordinary care under any and all circumstances, said:

"The policy of the law has relegated the determination of such questions to the jury under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury."

And in Gardner v. Michigan Central Railroad, 150 U. S. 349, 361, 14 Sup. Ct. 140, 144, 37 L. Ed. 1107, the court said that:

"The question of negligence is one of law for the court only where the facts are such that all reasonable men must draw the same conclusion from them; or, in other words, a case should not be withdrawn from the jury unless the conclusion follows as matter of law that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish."

The circumstances of the present case were very peculiar, and the situation was unusual. The following statement of facts and inferences is justified by the evidence: The main tracks of the railroad ran parallel with the street (Second avenue) and at a distance of only 40 feet north therefrom. The branch to the switching yards crossed the street at an acute angle. The train was coming from the west over the east-bound track. Whether it was an east-bound through train or was destined for the switching yards south of the street could not be discovered by pedestrians on the street until it turned off from the main track at the junction. Connell was walking eastwardly on the sidewalk. When he passed the upstanding west side safety gates, the train was not visible to one looking back from that point. If, hearing the puffing of a locomotive, he turned to look when he was 30 or 40 feet east of the west side safety gates, he would see that the train was on the main east-bound track. The safety gates on both sides of the crossing were standing up. Connell did not know that they were out of order and not working. The flagman employed by the com-

pany to warn the public of danger from an approaching train about to cross the street was absent from his post, asleep in the signal tower. The point of junction where the train left the main east-bound track was distant from the sidewalk only about 250 feet and about 8½ seconds in time. The train did not approach Connell on a line crossing his pathway at right angles, but it came behind him on a line diagonal to the street. Moreover, there was testimony that no bell was rung or whistle blown. Upon such evidence, and in view of the principles enunciated by the Supreme Court in the above-cited cases, how could the trial judge properly have withdrawn from the jury the determination of the question of the alleged contributory negligence of the deceased and directed a verdict for the defendant? That the safety gates on both sides of the crossing were standing up was a most important fact, and was properly for the consideration of the jury, in connection with the other circumstances of the case. It was for the jury to say whether or not the upright position of the safety gates misled Connell. We think that their upstanding position on this occasion might well indicate to one walking on the sidewalk eastwardly toward the crossing that the oncoming train from the west was an east-bound through train going over the main line. The very purpose of the safety gates was to give public warning, when they were lowered, of the approach of a train intending to cross the street by the branch line. The upstanding safety gates on the west side would signify to a man of prudence that no train was about to cross the street, and he would be confirmed in that belief as he neared the crossing upon seeing the safety gates in front of him on the east side standing up.

In Baltimore & Potomac Railroad v. Landrigan, 191 U. S. 461, 475, 24 Sup. Ct. 137, 141, 48 L. Ed. 262, Mr. Justice McKenna, speaking for the court, forcibly said:

"Gates at a railroad crossing have a useful purpose. Open, they proclaim safety to the passing public; closed, they proclaim danger."

In Glushing v. Sharp, 96 N. Y. 676, 677, the plaintiff attempted to cross the railroad in a covered milk wagon, which he drove. He looked some distance from the track, and saw no train. The gate was up. Had he stopped a second time, nearer the track, he could have seen the train in time to save himself, but he did not do so. The Court of Appeals held that the plaintiff's alleged contributory negligence was properly submitted to the jury under all the circumstances, and said:

"The raising of the gate was a substantial assurance to him of safety, just as significant as if the gateman had beckoned to him or invited him to come on; and that any prudent man would not be influenced by it is against all human experience."

In Railway Company v. Schneider, 45 Ohio St. 678, 690, 698, 17 N. E. 321, 324, the court said:

"To persons in the street who are approaching the railroad tracks with a view to crossing, an open gate is notice that the track is clear, and that it is

safe to cross. * * * Persons approaching such crossings have the right to presume, in the absence of knowledge to the contrary, that the gatemen are properly discharging their duty, and govern themselves accordingly; and it is not negligence on their part to act on the presumption that they are not exposed to dangers which can arise only from a disregard by the gatemen of their duties."

In Pennsylvania Company v. Stegemeier, 118 Ind. 305, 310, 312, 20 N. E. 843, 845, 10 Am. St. Rep. 136, the court said:

"The case at bar is to be discriminated from those in which the injured person enters upon a track where there are no affirmative assurances of safety, for here the fact that the gates were up and no warning given by the flagman was an affirmative assurance of a safety upon which a citizen might act without being chargeable with negligence. * * * The deceased was not simply thrown off his guard, but he was also assured that there were no approaching trains, and this assurance dispensed with the vigilance that under other circumstances would have been required of him. This assurance too completely relieved him from the imputation of negligence in going upon the tracks."

In Evans v. Railroad Company, 88 Mich. 442, 445, 50 N. W. 386, 387, 14 L. R. A. 223, the court said:

"It has been frequently held that when gates are provided the public have a right, the gates being open, to presume, in the absence of knowledge to the contrary, that the gatemen were properly discharging their duties, and that it was not negligence on their part to act on the presumption that they were not exposed to a danger which could only arise from a disregard of their duties by the gatemen."

In Roberts v. Delaware & Hudson Canal Company, 177 Pa. 183, 190, 35 Atl. 723, 724, the court affirmed as correct the proposition that:

"Safety gates, which should be closed in case of danger, if standing open are an invitation to the traveler on the highway to cross; and, while this fact does not relieve him from the duty of exercising care, it is a fact for the consideration of the jury in determining whether he exercised care according to the circumstances."

Upon the whole we think it was for the jury to determine whether Connell, in the peculiar circumstances, acted with that degree of care which persons of common prudence and intelligence would exercise when placed in a similar situation, and that the court below was right in submitting to the jury the question of contributory negligence.

We think that the assignment of error to the admission of testimony of the witness P. J. Biggy should not be sustained. He had been a conductor in the defendant's service for a long time prior to 1901, and was quite familiar with the locality at Marion Junction, and with the branch railroad at that place. His competency as an expert was sufficiently shown. We think there was no error in permitting him to testify as an expert as to the rate of speed at which the locomotive would have to go in order to get the train across the street and into the yards.

We find no error in this record, and therefore the judgment is affirmed.