## ISAAC R. CLARK *vs.* BOSTON AND MAINE RAILROAD.

Hampshire.    September 17, 1895. — October 18, 1895.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Railroad — Grade Crossing — Due Care — Negligence — Law and Fact — Trial.*

There is no absolute rule of law that a traveller approaching the crossing at grade of a highway by a railroad must, under all circumstances, stop to look and listen for a train before entering upon the railroad.

The fact that a traveller approaches with a team the crossing at grade of a highway by a railroad at a trot with a heavy load does not of itself render his conduct negligent, it not appearing, in an action by him against the railroad corporation for personal injuries occasioned by being struck by a train, that he could not have stopped if he had had reasonable notice of the coming train.

In an action against a railroad corporation for personal injuries occasioned to the plaintiff by being struck by a train at the crossing at grade of a highway by the railroad, it is for the jury to say what was the object of a flag suspended over the railroad track from the gate tower, and whether its presence had or should have had any effect upon the conduct of those in control of the train, or of the gateman.

In an action against a railroad corporation for personal injuries, if the plaintiff puts in evidence a rule of the corporation relating to danger signals, and the defendant afterwards puts in a later rule which was in force at the time of the accident, it is competent for the judge to allow the plaintiff to withdraw the rule put in by him, and to direct the evidence relating to it to be stricken out and to be disregarded by the jury.

TORT, for personal injuries occasioned to the plaintiff, by being struck by a train at the crossing at grade of a highway by the defendant's railroad in Northampton, through the alleged negligence of the defendant. Trial in the Superior Court, before *Maynard*, J., who allowed a bill of exceptions, in substance as follows.

The plaintiff contended that the defendant was negligent because the gates at the crossing were not closed when a train was about to cross the highway, because the engineer gave no seasonable warning signals, because the gate-keeper nodded to him, which he took to be an invitation to cross, and because the defendant had by its employees put out a red flag on the easterly side of the gate-keeper's tower at a point about nine feet from the ground, and by the side of and over the track on which the

train passed, which flag was a signal to the engineer of the incoming train to proceed slowly or stop his train, and this signal was not observed and obeyed, but the train approached the crossing at a rapid rate of speed, and at the same time the gateman, relying upon this flag to stop the train, did not attempt to put down the gates.

The plaintiff offered evidence tending to show that he was approaching this crossing from the west, with a load of hay weighing about one ton and drawn by a pair of farm horses; and that he approached at a moderate speed, and watched and listened for any approaching train, and did not see or hear any until he was upon the tracks, when he was struck by a passing train and received the injuries complained of. The train was going south on the track next east of the gate-tender's tower. The gates were up when the plaintiff approached and entered upon the crossing. The evidence was conflicting on the question whether the gate-keeper made any attempt to close the gates.

There was evidence tending to show that the gates were partly lowered as the plaintiff drove under the westerly gate. The gate-keeper testified that he started to lower the gates as soon as he saw or learned of the approach of the train, and as soon as its approach could be known from the tower where he watched; and that the only reason he did not lower the gates clear down was because the plaintiff's team was under the westerly gate before there was time to get them down.

The defendant offered evidence tending to show that the gate-keeper from his tower could see the approaching train eleven hundred feet away; that a traveller on the highway approaching as the plaintiff did could see the train when it was twelve hundred and seven feet away; that for a distance of one hundred feet from the track, where the street is descending, the plaintiff approached with his horses trotting at a rate of from four to six miles per hour; that he approached the crossing without listening or looking up the tracks until after he was on them; that he was familiar with this crossing and knew of this train, which was due about noon, but which was that day about five or six minutes late; and that he supposed that the train had not passed.

The plaintiff's evidence tended to show that freight cars stood on intervening tracks, so that a train approaching from the north could not be seen; and that at a very short distance back a brick structure three stories high prevented one from seeing the train. The plaintiff testified that he looked and listened as carefully as he could; that he had his team under control; that he heard no signals and saw no train approaching until he had driven on the westerly tracks; that he got the gate-tender's nod when he was about one hundred feet west of the crossing, where he started on a slow trot which he continued until he was struck; and that, just as he saw that the train was upon him, he tried to turn to the right to avoid the train and hastened his horses by swinging a pitchfork. The gate-tender denied that he gave a nod or signal to the plaintiff.

The defendant's evidence tended to show that the plaintiff's view when he was west of the crossing was entirely unobstructed by cars or otherwise.

There was also evidence tending to show that the train, consisting of an engine, truck, and two passenger cars, stopped after the rear car had passed the crossing only a few feet; that the bell had sounded continuously for a distance of eighty rods or more; that the fireman and engineer did not see the red flag, and did not see the plaintiff's team until they were within about three hundred feet of the crossing; and that no danger signals were given by the whistle, and no special effort made to stop the train, until it was within one hundred and fifty feet of the crossing.

The engineer testified that he saw the plaintiff when he was approaching, but had not entered upon the crossing, and, in watching him and trying to save him after he saw that he was going on to the track, he did not see the flag; and that, if he had seen it, it would not have made any difference with his speed at the crossing as the flag had no reference to the crossing but to the freight yard south of the passenger station, where there was a freight train. The fireman's station was such that he could not see the flag.

The defendant introduced testimony tending to show that the red flag was put out because there was a freight train in the yard southerly of the passenger depot. The plaintiff relied upon

the rules of the corporation, which were in evidence, as tending to show that an approaching train should reduce its speed or stop at the signal of a red flag upon the track. He did not see the red flag, or know that it was there.

The plaintiff called John Mulligan, President of the Connecticut River Railroad Company, which operated the road in question until a short time before the accident, who produced the rules of that company promulgated on November 29, 1891; and he testified that they were the rules under which the road was operated at the time the defendant took possession. He also called the local agent of the defendant, who testified that, at the time of the accident, the road was operated under the rules which were in force before the defendant took possession.

From the rules produced by Mulligan the plaintiff offered and read to the jury the following sections : " Red flags by day or red lights by night displayed on the tracks are signals of immediate danger, and not to be disregarded, and the train must be brought to a stop as soon as possible. Two flags, one red and one white, placed by the side of the track, is a caution signal, and trains must proceed with care until the obstruction is passed."

The defendant offered evidence tending to show that an edition of the rules later than the one produced by Mulligan was in force at the time of the injury, and offered in evidence the following rules : " A red flag or a red light displayed on the track signifies danger, and is a signal to stop. A stationary red flag, red light, or slow board by the side of the track, denotes that the track is imperfect, and the train must proceed with great caution, not exceeding eight miles per hour."

The plaintiff's counsel thereupon stated that, the book of rules last offered now appearing to be the rules in force at the time of the accident, he desired to withdraw the evidence of the rules produced by Mulligan. The judge, in the exercise of his discretion, allowed the evidence to be withdrawn, and ordered it stricken out, and directed the jury to disregard the evidence of the book of rules dated November 29, 1891, and to disregard Mulligan's testimony in relation thereto. The defendant excepted. The defendant asked the judge to rule that, if a plaintiff drove down a highway descending upon the tracks from a point

more than one hundred feet back from the crossing with a heavy load of hay, and upon a trot, without stopping to look or listen, his conduct would be negligent, even if the gates were up as he approached the crossing.   The judge declined so to rule; and the defendant excepted.

The judge, among other things, instructed the jury as follows: " A person who should approach a railroad crossing without looking to see or listening to hear if a train were coming, if that was all there was to it, could not be said to be in the exercise of due care, because a crossing is a place of danger, and that person who approaches it without listening or watching, unless there was some circumstance to justify him in not doing it, is not in the exercise of due care.   Was there anything of this kind in this case to justify this man in crossing?   Did this man look?   Did he listen?   If he did not do one or both, was there anything to justify him in not doing either one or both?   Did he have any invitation to cross?   Did the railroad corporation by its servant or servants invite him to cross, or did it invite him in such a way that, acting as a reasonable and prudent man, he would be justified in attempting to cross without listening or looking?   Was there any notice of that sort which would cause him to attempt to cross without taking such precaution as a man of reasonable care and prudence would do?   If not, if he entered upon that road without taking this precaution, he would not be in the exercise of due care."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*W. G. Bassett*, for the defendant.

*J. C. Hammond*, for the plaintiff.

MORTON, J.   The instruction requested by the defendant, that if the plaintiff, without stopping to look or listen, approached the crossing at a trot, with a heavy load, on a highway descending for more than a hundred feet from the tracks, he would be negligent even if the gates were up, was properly refused.

A railroad crossing is a place of danger, and a traveller approaching one is bound to exercise that degree of care which the dangerous character of the place requires of a person of ordinary prudence.   But there is no absolute rule of law which obliges him under all circumstances to stop to look and listen.   Gener-

ally he must look and listen, and in such a manner that the looking and listening will enable him to see or hear an approaching train with reasonable certainty if one is within the range of his sight or hearing. *Fletcher* v. *Fitchburg Railroad,* 149 Mass. 127. *Tyler* v. *Old Colony Railroad,* 157 Mass. 336. *Connolly* v. *New York & New England Railroad,* 158 Mass. 8. But it cannot be said, as matter of law, that there may not be circumstances which will excuse him from looking and listening, and especially from stopping to look and listen. In the present case there was evidence tending to show an invitation on the part of the gateman to the plaintiff to cross. The fact that the plaintiff approached the crossing at a trot with a heavy load on a descending grade, if it was a fact that he did so, would not of itself render his conduct negligent, there being nothing to show that he could not have stopped if he had had reasonable notice of the coming train.

It was for the jury to say what the object of the flag was, and whether its presence had or should have had any effect upon the conduct of those in control of· the train, or of the gateman. It appearing that the rule in force at the time of the accident was the one put in by the defendant, it was competent for the court to permit the plaintiff to withdraw the one put in by him, and to direct the evidence in relation to it to be stricken out and to be disregarded by the jury. *Costello* v. *Crowell,* 133 Mass. 352. *Smith* v. *Whitman,* 6 Allen, 562. It is to be presumed that the jury followed the instructions of the court, and it does not appear that the defendant was harmed by the course which the trial took.

*Exceptions overruled.*