FRANK L. TILTON, administrator, *vs.* BOSTON AND ALBANY RAILROAD COMPANY.

Berkshire.    September 14, 1897. — October 20, 1897.

Present: FIELD, C. J., ALLEN, MORTON, & BARKER, JJ.

*Loss of Life — Railroad — Grade Crossing — Due Care — Law and Fact.*

Where the evidence in an action against a railroad corporation for causing the death of A., whose team collided with a train at a grade crossing, shows that the view of the track, in approaching it from a highway over a bridge, was more or less obstructed; that his son, who was fourteen years old and drove on this occasion, A. being blind but not deaf, both looked and listened for a train before entering upon the bridge, but saw and heard none; that when reaching the end of the bridge, twenty-two feet from the track, the son first saw the flagman, who was coming from his shanty between the bridge and the track with his flag furled, but who said nothing; that the son at once tried to stop his horse, but it went upon the track; and that he then heard the approaching train for the first time and struck the horse in order to get across, and the collision resulted, — it cannot be said, as matter of law, that there was no evidence of due care on the part of A. and his son.

TORT, in two counts, under Pub. Sts. c. 112, §§ 212, 213, by the administrator of the estate of Ralph Martin, for causing his death. At the trial in the Superior Court, before *Bishop*, J., the jury returned a verdict for the plaintiff on the first count, and for the defendant on the second count; and the defendant alleged exceptions. The facts appear in the opinion.

*M. Wilcox*, for the defendant.

*J. F. Noxon*, (*J. C. Crosby* with him,) for the plaintiff.

FIELD, C. J.   The only exception in the case is to the refusal of the court to rule that, on the evidence, the plaintiff was not entitled to recover upon either count of the declaration.   The jury returned a verdict for the plaintiff on the first count, and for the defendant on the second.   The first count was drawn under Pub. Sts. c. 112, § 212, and the second under § 213 of the same chapter.   At the argument in this court it was not seriously contended by the counsel for the defendant that there was not some evidence for the jury that the flagman employed by the defendant at the crossing was grossly negligent or careless, and the remaining question is whether there was evidence for the jury that the plaintiff's intestate was " in the exercise of due diligence " at the time when he was injured.   Martin, the plaintiff's intestate, at the time of the accident was fifty years of age and blind, but his hearing was good.   He was being driven by his son, who was fourteen years of age, in a market wagon attached to one horse, the son being on the right hand of the seat and the father on the left.   Martin the son was familiar with the crossing and knew that a flagman was stationed there.   There was evidence that this crossing was on the main business street of the town of Adams, which had a population of from nine to ten thousand, and that there was " a great deal of travel across it."   The accident occurred on December 13, 1895, in the daytime.   The railroad ran nearly east and west, and the train was running from west to east.   The father and son were travelling northerly on Centre Street.   The son testified, as the exceptions recite, that when he " got to the L. L. Brown paper mill he got first sight of the crossing.   Did n't known whether or not a train was expected at that time.   Knew that a flagman had been located at this crossing before that time.   There was no opportunity to see the railroad towards the west before they got to the L. L. Brown paper mill.   Passing the paper mill, until witness got to the bridge, Mr. Jenks's house, barn, and bandstand and trees obstructed the view of the track to the west.   Witness looked and listened for a train as he approached the bridge ; looked both ways ; looked for a flagman ; heard nothing of a train until he got to the bridge and saw nothing ; neither heard or saw anything of a flagman before he got to the bridge.   There was a light team ahead, two people in it.

The team was about the length of the bridge ahead of the witness.   As witness was going on to the bridge the other team was just going off from the bridge on the other side.   Up to that time witness had not seen or heard anything of a train, or any whistle or any bell; was listening for both.   When the team ahead crossed the tracks, witness was going off from the north end of the bridge.   First saw flagman when witness was off the north end of the bridge between the bridge and the track; flagman was just coming from the shanty; had a flag in his hand furled up; was unfurling it, I should think.   Had not heard or seen anything of a train up to that time.   When witness first saw the flagman he tried to stop his horse.   Before he could stop the horse, it got upon the track.   Had been driving about four miles an hour, on a sort of a dog trot.   Before he could stop his horse, the horse got upon the track.   When the horse was on the track he first heard the whistle of the train.   Had not seen or heard anything of the train before that.   He struck the horse and tried to get over as quick as he could.   He did not back the horse off because he thought he could get over quicker than he could back off.   The train was a very short distance away when it whistled.   The flagman said nothing.   Witness got some excited when he saw the train; train hit the hind wheel of the wagon.   Witness struck the horse after he saw the train to get across.   Witness's father was thrown out and killed as the result of the collision.   Witness was thrown down the road, but was not hurt."

The bridge was an open iron bridge, supported by trusses on the sides above the floor, and was fifty or fifty-two feet long.   The height of the girder above the floor of the bridge was six feet, and the depth of the girder about four and a half inches.   The distance between the northerly end of the bridge and the southerly rail of the railroad, the rail nearest to the bridge, was twenty-two feet.   There was a cattle guard one hundred and thirty feet westerly of the crossing, and a bank of earth twelve to fourteen feet high, westerly of the bridge, between the edge of the river and the southerly rail of the track.   On this bank, beginning forty feet westerly of the cattle guard, there were nineteen or twenty elm trees from one to two feet in diameter, at different distances from the southerly rail of the track, vary-

ing from sixteen to twenty-nine feet. These trees to a certain extent obstructed the view of the track by the son. On the space between the northerly end of the bridge and the railroad track, westerly of the highway, was the flagman's shanty, the dimensions of which were about six feet and three inches from east to west, seven feet and three inches from north to south, and it was from seven and a half to eight and a half feet in height. The train was running from twenty-two to twenty-five miles an hour.

Campbell, the engineer managing the train, on cross-examination testified as follows: " That he considered this crossing rather a dangerous crossing; that approaching this crossing as he did that day, he couldn't see a team approaching the crossing from the south until the horse had got on to the south end of the bridge; there were buildings that prevented seeing any team beyond the south end of the bridge. After the horse's head got to the centre of the bridge and until his head passed by the west end of the shanty there was a certain amount of obstruction to my view of the horse. The trees and this shanty obstructed the view to a great degree, so that he lost sight of the team between the centre of the bridge and the west end of the shanty." There was much other testimony concerning the opportunity which the son had of seeing the train, both before he drove upon the bridge and while he was upon it, and the testimony concerning the conduct of the flagman was contradictory.

The argument of the defendant's counsel is, that if the son and the father had been in the " exercise of due diligence " the son either would have seen or heard the train before he got dangerously near to the track, or that the father would have heard it, and that if they neither saw nor heard it, it was their duty to stop at or near the northerly end of the bridge before driving upon the track. But taking the son's account of the position and conduct of the flagman as the son drove off the northerly end of the bridge to be true, as the jury may have found, and considering the obstruction to the sight of the train which the jury on the evidence may have found to have existed, although the case is a very close one, we are unable to say, as matter of law, that there was no evidence for the jury of the due care or diligence of the father and the son. *Randall* v. *Connecticut*

*River Railroad,* 132 Mass. 269. *Johanson* v. *Boston & Maine Railroad,* 153 Mass. 57. *Hubbard* v. *Boston & Albany Railroad,* 162 Mass. 132. *Hicks* v. *New York, New Haven, & Hartford Railroad,* 164 Mass. 424. *Clark* v. *Boston & Maine Railroad,* 164 Mass. 434. *Conaty* v. *New York, New Haven, & Hartford Railroad,* 164 Mass. 572.          *Exceptions overruled.*