[L. A. No. 1333.    Department One.—February 10, 1906.]

## JOHN KOCH, Appellant, v. SOUTHERN CALIFORNIA RAILWAY COMPANY, Respondent.

RAILROADS—COLLISION AT CROSSING—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.—Where the plaintiff was long familiar with a railroad crossing, and while driving horses attached to a light spring wagon at a brisk trot across the track, was injured by collision with a freight-train, which plaintiff might have avoided with ordinary care, which he failed to exercise, he is guilty of contributory negligence as matter of law, notwithstanding the negligence of the railroad company in leaving the gates open, and in approaching the crossing without whistling or ringing the bell. [Beatty, C. J., dissenting.]

ID.—RAILWAY CROSSING A WARNING OF DANGER.—A railway crossing is itself a place of danger, and is an effectual warning of danger which must always be heeded; and the failure to exercise ordinary care in traveling over such a place is not excused by the negligent omission of the railway company to exercise ordinary care.

ID.—USE OF GATES NOT A WARRANTY.—While the *quantum* of care which will be reasonable may be less where gates are provided and are relied upon by the traveler, still the gates themselves are not such an assurance and a warranty as to justify the traveler in going

blindly ahead in total disregard of all ordinary precautions. He cannot rely wholly upon them, and cannot recover without showing more as to his own conduct than that he so relied.

APPEAL from a judgment of the Superior Court of Los Angeles County. M. T. Allen, Judge.

The facts are stated in the opinion of the court.

Edward F. Wehrle, and Anderson & Anderson, for Appellant.

C. N. Sterry, T. A. Norton, Paul Burks, and E. E. Milliken, for Respondent.

HENSHAW, J.—Plaintiff sued to recover damages for personal injuries occasioned him by reason of the alleged negligence of the defendant in so operating its trains that plaintiff was struck by one of them at the crossing of a street in the city of Pasadena. The negligence charged was the omission upon the part of the defendant company to sound the bell and to close the gates maintained at the crossing at the time of the approach of the train. Upon the taking of all the testimony the court instructed the jury to find a verdict for defendant, which the jury did, and the court's ruling in this regard is the subject of this appeal.

The consideration of the question necessitates the presentation of the evidence, which is here given, as favorably to the plaintiff as the facts warrant. Plaintiff, about ten o'clock at night, was driving two horses attached to a light spring wagon toward the railroad track at a gait which he describes as "a pretty fair trot," and which others describe as a "brisk trot." Colorado Street, upon which he was driving, is seventy-five feet wide, with an electric railroad track running along it a little south of the middle of the street. The sidewalk on the south side of the street is eleven feet wide. An alley thirty feet wide crosses Colorado Street at right angles, and defendant's railroad track also crosses the street in the center of that alley. The train which struck plaintiff's spring wagon consisted of a locomotive, thirteen loaded freight cars, and a caboose. It came from the south through this alley up a steep grade at a speed of about four miles an hour, and having come almost to a standstill at a station just beyond,

the engine was laboring heavily to get under way on the up-grade and "was puffing very hard with a loud exhaust." There was evidence tending to show that the engine-bell and the whistle were silent, and it will be assumed that they were. There were gates across the street on each side of the railroad track, and these gates were not closed as the train crossed the street. Colorado Street was paved with asphalt, and plaintiff's horses were newly shod with smooth shoes. He approached the track of defendant without checking the speed of his horses and "looking straight ahead." He says he could not see or hear the train, and first saw it when the noses of his horses were about on the railroad track. According to the map' or plat of the locality found in the record, as well as according to the undisputed evidence of witnesses, the buildings in the vicinity were so disposed that, if the plaintiff had been on the alert and driving with reasonable caution, he might have caught sight of the approaching train in ample time to have avoided the accident. Plaintiff was, and had been for six years, familiar with the crossing, but he took no precautions whatever before driving upon it. He did not stop. He did not slow up. He did not look. He did not listen. The clattering of his horses' feet and the noise of his wagon would certainly have interfered with his hearing the approaching train. He was moving faster than the train and failed to take any precautions by slowing up to listen, but had he been on the alert he could have heard and seen the train in time to have avoided the accident. It is difficult to understand, then, how he could have come into collision with this slow-moving locomotive, excepting that he either absent-mindedly or recklessly approached and drove on the track. Indeed, from his own testimony, it is plain that he approached the crossing with a total disregard of its dangers. In substantiation of this is his statement to one of the witnesses, which is not denied, that "My main idea was to get home. I was not paying any attention to anything." Under the facts, then, the plaintiff, after accepting the invitation to proceed, extended to him by the open gates, used no precaution whatsoever, did absolutely nothing for his own protection and safety. He did not lessen the speed of his horses; he did not listen for the approach of the train, which was made audible to others some time before he drew near the crossing;

he did not look for the train, as he himself testifies he kept his eyes straight ahead; and the first intimation he had of its approach was when his horses shied away from the engine.

The case thus presented is not one as to the degree or amount of care which should be exercised by one about to cross a railroad under the invitation to proceed given by the open gates, but whether under such circumstances a man may fail or decline to exercise any care whatsoever, treating the open gates as a positive assurance of safety. Of course, in any case such as this, where it is shown that a plaintiff has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by the jury. But where, as here, the unconflicting evidence shows that he exercised no care whatsoever, it becomes a question of law to say whether or not such a plaintiff's case shall be submitted to the jury. If it is so submitted, it can only be upon the theory that the open gates were an absolute warranty of safety, justifying the plaintiff in proceeding without any heed or caution. It is for this proposition that appellant contends. But such we do not understand to be the law. A railway crossing is itself a place of danger and is an effectual warning of danger, a warning which must always be heeded, and the exercise of ordinary care in traveling over such a place is not excused by the negligent omission of the railway company itself to exercise reasonable care. (*Green* v. *Southern California Ry. Co.*, 138 Cal. 1, [70 Pac. 926]; *Herbert* v. *Southern Pacific Co.*, 121 Cal. 227, [53 Pac. 651]; *Lambert* v. *Southern Pacific Co.*, 146 Cal. 231, [79 Pac. 873].) Nor is it the law that when a railroad company adopts safety gates or any other appliance for the protection of the public the public is thereby absolved from all duty of taking care of itself. A person is still required to exercise due and ordinary care, and while the *quantum* of care which will be reasonable may be less where the gates are provided and are relied upon by the traveler, still the gates themselves are not an assurance and a warranty such as to justify a traveler in going blindly ahead in total disregard of all ordinary precautions, as did the plaintiff in this instance. (*Greenwood* v. *Philadelphia etc. Ry. Co.*, 124 Pa. 572, [17 Atl. 188, 10 Am. St. Rep. 614]; *Rangeley* v. *Southern R. R. Co.*, 95 Va. 715, [30 S. E. 386];

*Pennsylvania etc. Ry. Co.* v. *Pfuelb*, 60 N. J. L. 278, [37 Atl. 1100]; *Dawe* v. *Flint etc. Ry. Co.*, 102 Mich. 307, [60 N. W. 838]; *Romeo* v. *Boston etc. R. R. Co.*, 87 Me. 540, [33 Atl. 24]; Thompson on Negligence, sec. 1614.)

The case of *Ellis* v. *Boston etc. R. R. Co.*, 169 Mass 600, [48 N. E. 839], contains a critical review of the matter and it is said: "The raising of the gates was, no doubt, a circumstance which justified the plaintiff in starting to cross the railroad when he did, and he had a right to expect that if any engine or train was approaching the crossing on the inbound track a whistle would be sounded or a bell be rung. But in attempting to cross the railroad he was bound, in the exercise of ordinary care, to himself exercise his own powers of observation, and to take thought for his own safety; and he was not entitled to have his case go to the jury unless there was evidence from which it could be inferred that he did this. No such inference can be drawn either from his own testimony or that of the other witnesses. The general rule that one who attempts to cross a railroad track must reasonably use his own powers of observation to assure himself that there is no danger from approaching trains is clear. (*Chase* v. *Maine Coast R. R. Co.*, 167 Mass. 383, [45 N. E. 911], and cases cited.) And the rule applies to one from whom a train approaching upon a second track is hidden by a train which has just passed. (*Bancroft* v. *Boston etc. R. R. Co.*, 97 Mass. 275; *Winslow* v. *Boston etc. R. R. Co.*, 165 Mass. 264, [42 N. E. 1133].) While the raising of the gates justified the plaintiff in attempting to cross when he did, and while that fact and the facts that no whistle was sounded and no bell was rung are to be taken into consideration on the question of how much he must himself look and observe as he makes his way across, these circumstances do not excuse him from looking and listening and taking thought for his own safety. He cannot rely wholly upon them, and cannot recover without showing more as to his own conduct than that he so relied. (*Butterfield* v. *Western Ry. Corp.*, 10 Allen, 532, 87 Am. Dec. 678; *Merrigan* v. *Boston etc. R. R. Co.*, 154 Mass. 189, 28 N. E. 149; *Tyler* v. *Old Colony R. R.*, 157 Mass. 336, [32 N. E. 227].) We are of opinion that, as matter of law, there was no evidence from which it could be found that the plaintiff himself exercised due care, and the verdict for defendant was rightly ordered. Exceptions overruled."

Excepting for the presence of gates, this case is parallel in its facts with *Hager* v. *Southern Pacific Co.*, 98 Cal. 309, [33 Pac. 119]; but, as has been said, the presence of gates does not justify the total indifference and disregard to danger which was evinced by plaintiff in this case.

The judgment appealed from is therefore affirmed.

McFarland, J., Lorigan, J., Angellotti, J., and Shaw., J., concurred.

BEATTY, C. J.—I dissent. When the superior court instructs a jury to find for defendant, this court in reviewing the judgment must not only assume the entire truth of plaintiff's evidence, but must give him the advantage of every inference which can be fairly drawn from it. Conflicting evidence, and inferences from it, must be wholly disregarded. This proposition seems to be conceded by the court, and certainly it is fully supported by the first decision cited in its opinion on the principal question of law presented by the case. (*Greenwood* v. *Philadelphia etc. Ry. Co.*, 124 Pa 576, [17 Atl. 188, 10 Am. St. Rep. 614].) I think, however, that in stating the case this rule has not been strictly observed with respect to important particulars. The statement that the plaintiff was moving faster than the train is based entirely upon the opinion of defendant's witnesses—the engineer and fireman—that they were going about four miles an hour, but this evidence was weakened by the admission that the average speed of the train between Los Angeles and San Bernardino was fifteen miles an hour, and that the grade they were ascending at the place of the accident was but a minute fraction over one per cent (1.06). It was also in conflict with equally definite evidence on the part of the plaintiff, from which the jury would have been warranted in finding that the speed of the train was at least fifty per cent in excess of plaintiff's speed. Two entirely disinterested witnesses, Holloway and Simons, crossed the track going west just before the accident. They were in a buggy, proceeding at a slow trot. Holloway testified that they met plaintiff about one fourth of the length of the block from defendant's track (about fifty feet), and Simons, testifying as a witness for defendant, stated that when they came in sight of the train at the crossing, it (meaning, I suppose, the headlight) was

about midway between Green and Colorado streets, a distance
of more than two hundred feet from the point of collision.
Conceding that this character of evidence is somewhat in-
definite, it is no more indefinite than the estimate of defend-
ant's witnesses that the train was moving about four miles an
hour, and, accepting it as approximately correct, it proves that
while the buggy, proceeding at a slow trot, moved fifty feet
from the track to the point where it met plaintiff's wagon,
and while plaintiff, moving at a brisk trot, proceeded another
fifty feet to the point of collision, the train had moved twice
as far, necessarily at a rate of speed twice the average speed
of the two vehicles, and probably at a rate much faster than
that of the plaintiff. This fact has an important bearing
upon another fact which is highly material, in view of the
rule as to contributory negligence to be considered here-
after. For, if plaintiff was moving six miles an hour (I
assume this rate because in the discussion here it has been
agreed that a brisk trot is equivalent to at least six miles an
hour), the train was moving nine miles an hour, and it is
susceptible of mathematical demonstration from other data
supplied by the uncontradicted evidence of actual measure-
ments that plaintiff could not have seen the headlight of the
train until the heads of his horses were within twelve feet of
the track (i. e. less than a second and a half of time). These
data are: A solid row of brick buildings extending from a
line fifteen and one quarter feet west of the center of the
track a distance of one hundred and fifty feet—the entire
length of the block. It was dark. The first part of the train
that plaintiff could have seen was the headlight, which was
moving north on a line fifteen and one quarter feet east of
the brick building adjoining the alley. Plaintiff was moving
east on a line about twenty-one feet north of the same building.
His rate of progress was six miles an hour, equivalent to eight
and four fifths feet a second. The train, moving at the rate
of nine miles an hour, would cover thirteen and one fifth feet
a second. Plaintiff sat fourteen feet back of his horses' heads.
The hind wheels of his wagon extended four feet farther to
the rear. The collision was with his hind wheel as he was
clearing the track at the east rail.

It will be seen in the ensuing discussion, as it appears from
the opinion of the court, that in cases of this kind it is always

a material question whether the plaintiff, after discovering his danger, was able to avoid it, and one of the questions here is whether this court can hold, as matter of law, that the plaintiff, within the brief space of a second and a half, could have reined in his horses or done anything more prudent after seeing the locomotive than to try to cross ahead of it. It will be seen that in the opinion of the court the conduct of the plaintiff and his whole case takes its color from the assumed slow motion of the train and his own reckless speed. If it be true that upon this point there is, as I have attempted to show, evidence warranting the inference that the speed of the train was fifty per cent in excess of the plaintiff's speed, we must for the purposes of this appeal take that as a fact proven, and we are not then forced to conclude that it was the mere recklessness or absence of mind of the plaintiff which placed him in front of the locomotive. For he tells us plainly what he was doing and why he did it. He knew the crossing, and he knew that the defendant guarded the crossing by gates which, from his observation, were always lowered when trains were passing. He knew he was approaching the crossing, and he "kept his eyes straight ahead in order to see if anything was in the way." His idea was—as is probably the belief of a majority of men—that where the state of traffic calls for the erection of crossing-gates, the duty and the practice of the railway company is to employ men to attend them and to close them on the approach of a train, and not alone in the daytime, but at all times at which trains may be expected to pass. So believing, and seeing the gates open and motionless, he took it as an assurance of safety and an invitation to proceed. A fair construction of his testimony shows that he was acting consciously upon this view of the situation, and not with a mind solely intent upon getting home, and oblivious to everything else. It is true he did not go upon the stand and formally deny the statement of one of defendant's witnesses, which is quoted in the opinion of the court, to the effect that he was not paying attention to anything, but that evidence was contradicted in advance by the whole tenor of his testimony in chief, and the expression itself, admitting it to have been reported with literal fidelity, was used within twelve hours after the accident, very shortly after he recovered consciousness, and while he was acutely suffering from concussion

of the brain. Considering that of the three agents of defendant who were sent to the hospital to obtain plaintiff's statement, one, its "special inspector," did not testify; that another, a surgeon, testified to a statement not at all at variance with plaintiff's testimony at the trial; and that only one, the operator at the Pasadena station, testified to the expression quoted,—I do not think we can assume , a fact that the plaintiff in approaching the crossing was not paying attention to anything. On the contrary, the case, as the plaintiff might reasonably have asked the jury to view it, and we therefore are bound to view it in considering the instruction to find for the defendant, was simply this: The plaintiff, perfectly aware that he was approaching a city crossing guarded by gates which, according to his experience, were always lowered on the approach of a train, drove forward without slackening the brisk pace of his horses because he saw the gates standing open, and because he regarded the open gates as an assurance of safety and an invitation to pass. He looked straight ahead to see if there was anything in the way, and was entirely excused from looking in the direction of the approaching train, because his view in that direction was cut off by a solid row of brick buildings which prevented him from seeing the locomotive until it was too late to have avoided the accident. He might, however, have heard the sound (the loud exhaust of the engine) made by the train if he had stopped to listen. Or if he had so slackened his pace as to leave him in perfect control of his team, he would have seen the locomotive in time to have pulled up while the train was passing. The question is whether it was his duty under the circumstances to stop for the purpose of listening, or to approach the gates so cautiously that he could rein in his horses instantly on the sudden appearance of the train emerging from behind the building which obstructed his view. The question, in other words, is whether the rule that the failure on the part of a traveler to stop and look and listen is negligence in law (negligence *per se,* as it is sometimes designated) applies to a grade crossing of a city street which, in compliance with municipal regulations or by the voluntary act of the railroad company, is guarded by gates arranged to be lowered while trains are passing, or by flagmen habitually stationed there for the purpose of signaling that the way is clear.

Upon this question the cases and the text-writers are by no means agreed. There are decisions both ways, and the text-writers have inclined to one side or the other according to their respective views of public policy. The opinion of the court cites only section 1614 of Thompson on Negligence, and the cases referred to in illustration of the text. But section 1614 of Dr. Thompson's work does not state his view of the question. It states the view to which he is evidently opposed, as will be seen by reference to the preceding section (1613), where he says: "Many decisions . . . concede that the traveler approaching a railway crossing has the right to rely upon the fact that the gate is open, or that the flagman is absent from his post, and to assume from these indications that no train is approaching, and that he may safely proceed to cross; and so where the gates are up and a flag flying, indicating that a train will stop before reaching the crossing; and so where the traveler, having waited several minutes, starts to cross on the gates being raised. While, as we shall soon see" (referring to section 1614, cited by the court), "some courts condone the fault of the railroad company in luring the traveler to his death or injury by deceptive appearances, and visit all the blame on the traveler, yet even these courts concede that a traveler approaching a crossing guarded by gates is not required to exercise the same vigilance in looking and listening as when he approaches one not so guarded," etc.

With the sole exception of the Pennsylvania case, the decisions cited in the opinion of the court will be found on examination to furnish a very slender support to its conclusion. In *Greenwood* v. *Philadelphia etc. Ry. Co.*, 124 Pa 572, [17 Atl. 188, 10 Am. St. Rep. 614], the doctrine contended for by defendant is indeed carried to its extreme limit. There a hose-cart, responding to an alarm of fire (a false alarm, as the event proved), was driven rapidly upon a gate crossing and one of the firemen injured by a passing train. An instruction to find for the defendant was affirmed because it appeared that the driver of the cart, relying on the open gates, did not stop to listen as he approached the crossing. Outside of Pennsylvania, I think, it would be difficult to find a case going to this extent. In every other case cited the person injured was a pedestrian, and in every case the decision turned upon the fact that the plaintiff, after passing the gates, could

have seen the approaching train in ample time to have avoided the accident if he had used his eyes.   This was the whole point of the decision, and in each case, except the New Jersey case, previous decisions of the same court, in which it had been held that travelers had a right in approaching a grade-crossing to rely upon open gates as an assurance of safety, were distinguished upon the ground mentioned.

Take the Virginia case—*Rangeley* v. *Southern Railway Co.,* 95 Va. 715, [30 S. E. 386].   The facts of that case are stated at page 720 of 95 Va. [and page 387 of 30 S. E.], as follows: "The record considered as on a demurrer to the evidence shows that the deceased, on the night of the accident, with his companion, left a restaurant, the porch of which extended to within eight or ten feet of the railroad track; that he went to a point on or near the track, and was standing there talking when struck by the defendant's train; that the night was dark, but that the locality was well lighted by lectric lamps; that the track was straight in the direction from which the train came, with nothing to obstruct the view in that direction after leaving the restaurant porch; that the train was backing about as fast as a man could walk, not over five miles an hour, upgrade, using steam, and that the bell was ringing from the time it commenced to back until after the unfortunate man was run over."   The court, discussing the refusal of an instruction which "in effect informed the jury that a person approaching a railroad crossing where gates are required to be kept and lowered on the approach of trains, has the right, when he sees that the gates are not lowered, to presume that no train is approaching, and that he is under no obligation to use his senses to ascertain whether a train is approaching," referred to another case reported in the same volume, for the correct rule in such cases.   (*Kimball* v. *Friend,* 95 Va. 125, [27 S. E. 901].)   The facts of that case were that the plaintiff rode a bicycle on the track at about the speed of a trotting horse.   The sides of a cut prevented him from seeing the approaching locomotive until he was too close to avoid the collision, and he was killed.   He did not stop to listen, and he did not approach the crossing at such a moderate rate of speed as would enable him to control his movements.   There was no direct evidence, of course, that he did or did not listen. Upon a very full discussion of the evidence and the rulings

giving and refusing instructions, the court holds that a traveler is not required to exercise the same vigilance in approaching gate-crossings as he must exercise at crossings not so guarded, and that in such cases the question of contributory negligence is peculiarly one for the consideration of the jury. The judgment for the plaintiff (defendant in error) was affirmed.

Next in order is the New Jersey case, *Pennsylvania Ry. Co.* v. *Pfuelb,* 60 N. J. L. 278, [37 Atl. 1100]. That was another case of a pedestrian walking upon a gate-crossing and being killed by a train which he could have seen approaching for a long distance before he stepped on the track, and a circumstance to which much weight was attached was the fact that when he was approaching the track he saw the gate standing open while another train was passing, which was notice that the open gates were not an invitation to cross.

*Dawe* v. *Flint etc. Ry. Co.,* 102 Mich. 307, [60 N. W. 838], was another case of a pedestrian injured by a train which she could have seen approaching, after passing the gates, long before it struck her. The case is distinguished from *Richmond* v. *Chicago etc. Ry. Co.,* 87 Mich. 374, [49 N. W. 621], and *Evans* v. *Lake Shore etc. R. R. Co.,* 88 Mich. 442, [50 N. W. 386]. The rule established by those cases, and not questioned by the Dawe case, is that "a party approaching a railroad track has a right to rely upon the absence of such warnings of danger, as is shown to be the custom of the railroad company to give." (See point 2, *syllabus,* p. 442, 88 Mich.) "When gates are provided by railroad companies at street-crossings, the public have a right, the gates being open, to presume, in the absence of knowledge to the contrary, that the gatemen are properly discharging their duties, and are not negligent in acting upon the presumption that they are not exposed to a danger which could only arise from a disregard of such duties" (And see *Van Auken* v. *Chicago etc. Ry. Co.,* 96 Mich. 307, [55 N. W. 971].)

A Maine case is next cited by the court, *Romeo* v. *Boston etc. R. R. Co.,* 87 Me. 540, [33 Atl. 24]. This was another case of injury to a pedestrian who for a distance of eighty feet from the track had a plain view of the approaching train if she had raised her eyes to look. The case was distinguished, for this reason, from *State* v. *Boston etc. R. R. Co.,* 80 Me. 430, [15 Atl.

36], and *Hooper* v. *Boston etc. R. R. Co.*, 81 Me. 260, [17 Atl. 64]. In the first of these cases the gates had been erected voluntarily by the railroad company, and they did not operate them at night, but nevertheless it was held to be a question for the jury, whether the deceased was guilty of contributory negligence in driving on the track without stopping. The second case is to the same effect.

Coming to Massachusetts, an extensive quotation is made from the opinion in *Ellis* v. *Boston etc. R. R. Co.*, 169 Mass. 600, [48 N. E. 839]. I think it can hardly be said that the opinion in that case contains a critical review of the matter. The plaintiff walked through the gates and stepped on the track in front of a train that he could have seen if he had looked. It is expressly stated that the raising of the gates was a circumstance which justified him in starting across the track, but his failure to use his eyes when he was in perfect control of his own movements and in a place of safety was held to be negligence. It is an error, I think, to regard this case, or any of the cases in which a man or woman on foot was injured by a train they could have seen approaching if they had looked along the track, as authority in this case. With the single exception of the New Jersey case, they were all decided by courts that hold to the doctrine that open gates are an assurance of safety which justify the traveler to enter the crossing without stopping to listen, and all that is said in any of the decisions in regard to the obligation of the traveler to make use of his senses has reference to the ability of a pedestrian to avoid the danger after passing the gates by simply stopping when the train has come into his view. In this case the plaintiff could have done nothing to save himself after the train came in view. The views of the supreme court of Massachusetts regarding a case such as this are stated in *Clark* v. *Boston etc. R. R. Co.*, 164 Mass. 434, [41 N. E. 666]. There the plaintiff, hauling a load of hay with a team of two horses, drove at a trot down a grade to a gate-crossing without attempting to stop, and was injured. Exceptions to a verdict in his favor were overruled by the supreme court upon the ground that "there is no absolute rule of law that a traveler approaching the crossing at a grade of a highway by a railroad must under all circumstances stop to look and listen for a train before entering on the railroad." (First point of *syllabus*.)

CXLVIII Cal.—44

(See, also, *Conaty* v. *New York etc. Ry. Co.*, 164 Mass. 572, [42 N. E. 103], and section 1613 of Thompson on Negligence, and the cases cited under that section, particularly the opinion of Judge Elliott in the case of *Pennsylvania Co.* v. *Stegemeier,* 118 Ind. 306, [20 N. E. 843, 10 Am. St. Rep. 136], and the opinion of Judge Williams in *Railway Co.* v. *Schneider,* 45 Ohio St. 688, [17 N. E. 321].)    Both of these cases were very elaborately argued and considered, and the conclusions of the courts were widely at variance with the doctrine to which we are committing this court in the first case we have had to consider involving the question of negligence in approaching a gate-crossing. 'It is, in my opinion, very important on the first presentation of this question that this court should adopt that rule which is dictated not only by considerations of public convenience, but of humanity. If we lay down the rule that open gates at street-crossings are an assurance of safety to all persons and an invitation to pass without stopping to listen when the view is obstructed, I feel assured that the railroad companies will see that their gates are kept in order and tended by careful and competent keepers. There will be no accidents of this kind, and both life and property will be rendered more secure without any impediment to the great and increasing railroad traffic. Their trains will be able to move with the same or greater celerity than now, and without danger of encountering obstacles at the points where gates are established. But the traffic conducted by rail is not the only thing to be considered. The multifarious traffic of large cities upon their public streets is to be considered and promoted as far as it can be done without injury to more important interests, and since the careful operation of crossing-gates would be no interruption to the passage of trains, while it would leave the use of the streets free at all times when the gates were open, the rule which I advocate would conserve all interests at no cost except for the erection and repair of the gates, and the wages of keepers—a cost which in most cases would be trifling in comparison with the privilege of crossing the city streets at grade.

There is perhaps less difference between me and the court upon the question of law involved in this case than there is with respect to the facts. It is at all events recognized in the opinion of the court, that there is a distinction to be observed

between cases of accidents at gate-crossings and those at cross-
ings not so guarded.  This distinction was repudiated in a
majority opinion of the district court of appeal, and as the
judge who presided at the trial was one of the two justices
who concurred in that opinion, I am satisfied, not only from
that circumstance, but from the argument of counsel for
respondent here, that the case was taken from the jury upon
the assumption that it was governed entirely by the strict rule
applied to accidents at unguarded crossings in such cases as
*Green* v. *Southern California Ry. Co.*, 138 Cal. 1, [70 Pac.
926], and *Herbert* v. *Southern Pacific Co.*, 121 Cal. 232, [53
Pac. 651], and not upon the theory of this decision that the
plaintiff could have avoided the accident after the train came
within range of his vision.