[Civ. No. 9623. Third Dist. June 10, 1960.]

MELVIN L. WILLIAMS, Respondent, v. PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant.

692

696

Robert H. Gerdes, Richard H. Peterson, John J. Briare, R. A. Raftery, Henry J. LaPlante, John E. Griffin, Griffin, Conway & Jones and Gilbert L. Harrison for Appellant.

John J. Healy, Healy & Walcom, Robert K. Barber, Francis W. Halley and Zeff, Halley & Price for Respondent.

SCHOTTKY, J.—The Pacific Gas and Electric Company has appealed from an adverse judgment in the amount of $190,000 in an action brought by Melvin L. Williams to

recover damages for injuries incurred when the current from a high-tension line passed through his body.

For many years preceding this accident the West Stanislaus County Rural Fire Protection District maintained a lookout station on Mount Oso. The station was served by a one-wire telephone system owned by the district. The Evans Telephone Company by agreement used this line to service several customers, including the Gerber Ranch. Prior to the accident the Pacific Telephone and Telegraph Company made plans to construct a micro-wave relay station on Mount Oso. To provide power for the station the Pacific Gas and Electric Company extended its power line to the area. It obtained an easement from Paul Gerber to run its line over the Gerber Ranch. The high-tension power line rendered the one-wire telephone system inoperative because of inductive interference. To correct the condition required metallicizing the circuit, or, in other words, constructing a two-wire system. Shortly before the accident the Pacific Gas and Electric Company agreed to provide Evans Telephone Company with a second length of wire and other related material necessary to metallicize the system. There was a discussion relative to Evans Telephone Company contacting the Pacific Gas and Electric Company's poles though no formal agreement was entered into. It is evident from the record however that the Pacific Gas and Electric Company knew that Evans was to do the work of metallicizing the fire district's line, and it may be implied that Evans Telephone Company had permission of the Pacific Gas and Electric Company to contact the poles. The portion of the pole contacted had been reserved to the Pacific Telephone and Telegraph Company.

A week before the accident the Evans Telephone Company commenced the work. Two of its employees, Melvin Williams and Raymond Chandler, installed crossarms on the poles and were in the process of removing the telephone line from the old poles and moving it to the new when the accident occurred. On the day of the accident the men were working in hilly country near the Gerber Ranch. They had been taking line off the old poles and moving it to the power line and draping it over the new crossarms on the power poles. While moving line from the old poles to a pole referred to as pole 1, the telephone wire contacted the high-tension wire at pole 5. Just prior to the accident Melvin Williams was driving a truck to which the old line was attached, and apparently while so doing the telephone wire touched one of the jumper or trans-

position wires at pole 5. Melvin Williams was unable to testify as to the events which occurred. He alleged that he was unable to remember what had occurred the day of the accident. He had worked for the Evans Telephone Company about 18 months prior to the time of the accident. He was at the time 19 years of age. He had only a grammar school education. He had never worked in hilly country before. He had never taken any courses in electricity, and he had never been given any pamphlets by Evans Telephone Company on safety methods.

The Pacific Gas and Electric Company, hereinafter referred to as the appellant, first contends that there is no evidence in the record from which it may be inferred that it was negligent. It is appellant's contention that respondent was a trespasser, or at most a licensee, and therefore no duty to respondent was breached. It is therefore necessary to determine the status of respondent Williams at the time of the accident.

When the appellant received the easement to run its power line to the micro-wave relay station on Mount Oso, it promised according to the testimony of Paul Gerber, the grantor of the easement, that it would remedy any inductive interference to the telephone line running to the Gerber Ranch which was caused by the installation of the power line. After the line was installed the general manager of Evans Telephone Company notified the appellant of the inductive interference and of the fact that a fire district owned the line. Evans Telephone Company was then informed that the Stockton Division Office of appellant would get in touch with the proper official of the fire district to make arrangements for the shipment of the necessary materials to metallicize the line and to discuss the matter of contacting the poles of appellant. A letter from the engineer of communications to the Stockton division contained the following:

". . . It is requested that you obtain a list of materials and shipping instructions from . . . the Fire District at Patterson, so that the materials can be properly shipped. It would also be advisable that this telephone line contact our poles rather than being overbuilt with random crossings, as shown in the sketch that was provided to this office.

"Inasmuch as we have overbuilt the telephone line and that there is no other desirable route for our power circuit, it is felt that free contact should be given the fire district for this section of the line."

After receiving the letter from the appellant, and after

contacting the fire district, Evans Telephone Company ordered its employees, Raymond Chandler and respondent, to install crossarms on the appellant's poles and to transfer the telephone line from the old poles to the new; to lay the wire over the crossarms in a slack position; and to pull the telephone line just enough to give clearance where it crossed the road. No formal assent had been given to Evans Telephone Company to commence the work, but it is clear from the evidence that all parties knew that the work was to be done and that the appellant had granted permission to contact its poles. Respondent was engaged in transferring the line when the accident occurred.

We believe it is fairly inferable from the record that respondent was at the very least an invitee. There are two tests for determining whether or not a person is an invitee. One, which may be called the "economic benefit" test, proceeds on the assumption that affirmative obligations are imposed on people only in return for some consideration or benefit. (See 2 Harper & James on Torts, p. 1478.) This test can be applied here in determining that respondent was at least an invitee. Paul Gerber testified that when he granted the easement to the appellant it promised that it would remedy any inductive interference on the line. Evans Telephone Company was in the process of performing the task and its accomplishment would fulfill an obligation of the appellant. This would be a benefit within the rule stated.

Appellant contends, however, that Mr. Gerber's testimony can not be used to find a benefit to it since the deed granting the easement was silent on the matter and to use the evidence would violate the parol evidence rule. It is well established that material and relevant evidence that is incompetent and inadmissible under an exclusionary rule will support a judgment if offered and received without objection. (McCormick on Evidence, p. 126; Witkin, California Evidence, p. 751.) The rule is applicable to evidence violating the parol evidence rule. (*Pao Ch'en Lee* v. *Gregoriou,* 50 Cal.2d 502 [326 P.2d 135].) The evidence of Mr. Gerber can be used to establish the obligation of appellant and accordingly the benefit to it.

Appellant also contends that Evans Telephone Company and its employees were trespassers because of a written agreement entered into between the appellant and the telephone company in 1938 whereby Evans Telephone Company agreed it would not contact any of appellant's poles without

written permission. We think it is a sufficient answer to this contention that the parties were not acting under the written agreement in this operation, and its provisions were not applicable to the instant case.

Appellant also contends that the court erred in refusing to instruct the jury that if respondent exceeded the scope of his invitation he became a trespasser. The instruction was properly refused. Respondent was in the process of moving the telephone line from the old poles to the new. This was part of the very task he had to perform to correct the inductive interference. The mere fact that he may have pulled the wire which in turn contacted the high-tension wire would not make him a trespasser. Of course appellant did not want him to contact its wires, but if he did so accidentally while performing his work he would not thereby become a trespasser.

Respondent contends that appellant with full knowledge that the work of transferring the telephone line from the old set of poles onto its poles in order to make a two-way circuit to reduce or eliminate inductive interference was in progress nevertheless failed:

(1) to erect mechanical barriers to prevent physical contact between the telephone wire and the transposition wire at pole 5 as required by 2603, Electrical Safety Orders (Cal. Admin. Code, tit. 8, art. 37);

(2) to de-energize the newly erected high power distribution line which could have been done easily at the disconnect switches as required by 2603, Electrical Safety Orders;

(3) to remove the high voltage conductors as required by 2603, Electrical Safety Orders;

(4) to insulate the transposition wire at pole 5 as required by Act 2284, Deering's General Laws;

(5) to suitably insulate and cover by suitably protective covering the transposition wire which was a conductor in the form of a vertical run as required by General Order Number 95 of the Public Utilities Commission, rule 54.6-D;

(6) to furnish a safe place of employment as required by various sections of the Labor Code. (§§ 6300-6306, 6400-6405.)

One of the chief issues in the instant case was whether or not any of the transposition wires at pole 5 (the point where the telephone line contacted a transposition wire, which contact caused respondent's injuries) were vertical runs. Rule 54.6-D of General Order Number 95 requires that vertical runs be insulated. If any of the transposition wires were

vertical runs, the appellant would have been negligent for not insulating them. Rule 54.6-D reads in part:

"Conductors installed in the form of vertical runs on the surface of poles or not more than 18 inches from the center line of a pole shall be suitably insulated. . . .

"Conductors in the form of vertical runs more than 18 inches from the center line shall be suitably insulated and covered by a suitable protective covering or by securely supported impregnated fiber conduit without metal pipe. Such runs shall be located outside of the climbing and working spaces and shall not pass between conductors of different ownership except the pole pair and at a clearance therefrom of not less than 6 inches."

Rule 22.6 of General Order Number 95 of the Public Utilities Commission defines "RUNS mean vertical or lateral conductors supported in coverings or casings on overhead line structures, or certain insulated communication conductors supported along the surfaces of poles or crossarms."

Respondent's witness Silas P. Hagler, a professional electrical engineer, who was at the time of the trial a senior electrical engineer in the construction section of the Division of Architecture of the Department of Public Works, testified that the transposition wire which the telephone line contacted at pole 5 violated rule 54.6-D of General Order Number 95. It was his opinion that this transposition wire was in the form of a vertical run of wire. It violated the rule because it was not insulated. Appellant's experts testified that this transposition wire was not a vertical run.

The jury was instructed that it was to determine whether or not the transposition wire which the telephone wire contacted was a vertical run and to determine whether or not rule 54.6-D of General Order Number 95 was applicable. Appellant contends that this was error. Appellant contends that since the manner of the construction of the "transposition jumper" was undisputed it was a question of law whether or not General Order Number 95 was violated. We think that the trial court correctly instructed the jury. General Order Number 95 is to a lay individual a highly technical document. The definitions used in the order are not so clear that by showing the construction of a particular wire one can determine whether the statute has been met. In view of the sharp conflict in the evidence of the experts on the question whether or not the transposition wire was a vertical run, it was a question of fact for the jury to determine. (*Himrod Coal*

*Co.* v. *Stevens,* 104 Ill.App. 639.) Because it was a question of fact it was proper for the court to instruct the jury to determine whether or not the general order was applicable to the case.

Appellant contends also that respondent was guilty of contributory negligence as a matter of law. We do not agree with this contention. As was stated in *Anthony* v. *Hobbie,* 25 Cal.2d 814, at page 818 [155 P.2d 826] :

". . . The rule has been stated in various ways in a legion of cases, that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion."

And as stated in *Startup* v. *Pacific Electric Railway Co.,* 29 Cal.2d 866, at page 871 [180 P.2d 896] : "There was evidence that the driver of the automobile in which plaintiffs were riding took some precautions before crossing the tracks, and 'where it is shown that a (driver) has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by the jury.' (*Koch* v. *Southern California Ry. Co.,* 148 Cal. 677, 680 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A. N.S. 521].) It was therefore error for the court to instruct the jury that the driver of the automobile was guilty of negligence as a matter of law."

Respondent was driving a truck to which the telephone wire was attached. The purpose of the operation was to bring the wire from the old pole to pole 1. Respondent was unable to testify as to what occurred. His coworker, Chandler, testified that it was not the intent to pull the wire but merely to take it to the pole; that they thought they had plenty of slack; and that at the time of the accident respondent had reached the pole and was driving at right angles to the line. It was the pulling of the slack out of the wire that permitted the contact which caused the accident. All of the testimony indicated that pulling the slack out of the line without having all of the line in sight was not good procedure.

It must be conceded that the instant case is a very close one on the question of contributory negligence, and if it were

not for the fact that respondent was entitled to the presumption that he was exercising ordinary care for his own safety, it is doubtful if respondent could avoid a finding of contributory negligence. ▮ Appellant contends that respondent was not entitled to the benefit of this presumption and that the court erred in so instructing the jury.

▮ Appellant argues that there is no evidence whatsoever to show that the claimed amnesia of respondent was caused by the accident complained of. Respondent in reply points to the evidence that respondent suffered severe electrical burns requiring the amputation of a portion of both of his legs and horrible mutilating and disfiguring burns to his head, face, shoulders and torso, and to respondent's testimony that he had no recollection of the events of this accident nor anything occurring after getting up and going to work the morning in question. Respondent also asserts that at the trial appellant "never raised any question as to the fact that plaintiff did have retrograde amnesia from the shock and horrible injuries received in this accident which amnesia prevented him from testifying as to the facts of the accident;" and also that appellant did not raise that question on its motion for a new trial. Appellant in its reply brief does not deny this assertion. In view of the evidence in the record, we do not believe that appellant's contention that the claimed amnesia of respondent was not caused by the accident can be sustained.

▮ In *Gigliotti* v. *Nunes,* 45 Cal.2d 85 [286 P.2d 809], the court said at page 93: "Although there is no room for the presumption where the driver or other person whose claimed negligence is at issue himself testifies to his actions at the time involved (see *Speck* v. *Sarver* (1942), 20 Cal.2d 585, 587-588 [128 P.2d 16]), *the rule is established that if such person be deceased or unable to testify by reason of loss of memory, the fact that other witnesses for the parties testify fully as to the acts and conduct of the allegedly negligent person does not deprive the party relying on the presumption of the benefit thereof unless the testimony which he himself produces 'under circumstances which afford no indication that the testimony is the product of mistake or inadvertence . . . is wholly irreconcilable with the presumption sought to be invoked.'* (*Westberg* v. *Willde* (1939), 14 Cal.2d 360, 365-368 [94 P.2d 590]; *Mar Shee* v. *Maryland Assur. Corp.* (1922), 190 Cal. 1, 9 [210 P. 269]; *Chakmakjian* v. *Lowe* (1949), 33 Cal.2d 308, 313 [201 P.2d 801].)

Plaintiffs' evidence in the present case is not irreconcilable with the presumption.'' (Italics ours.)

In *Scott* v. *Sheedy*, 39 Cal.App.2d 96 [102 P.2d 575] (hearing denied), in which the court approved an instruction similar to the one attacked by appellant, the court said at page 101:

''In the instant case the essential difference factually is that the plaintiff did not die as a result of the accident, but suffered brain injury. The following appears in the record: 'Now, Mr. Scott, you need not answer it right away, you may consider it a little while, but is it your testimony now that you can't tell us anything about how this truck came to this opening? A. Yes, sir.' Under the circumstances, in view of the reason for the rule as stated in the Westberg case, we feel it can make no difference whether the injured party dies or is incapacitated by loss of all memory of the circumstances of the accident, the result of brain injury from the collision. In other words, notwithstanding the evidence from other witnesses, 'all possible facts both in favor of and against the alleged negligence of the plaintiff' (*Westberg* v. *Willde, supra* [14 Cal.2d 360]) were not before the court. In this case no witness could have testified that plaintiff saw the danger. A witness might place him in a position from which an inference might be drawn that he could see or realize danger, but that would not be sufficient if a reasonable inference otherwise could be drawn. If the acts and conduct of an incapacitated party must be testified to by other witnesses, we conclude that the test given in the Westberg case and in *Mar Shee* v. *Maryland Assur. Corp.*, 190 Cal. 1 [210 P. 269], is proper. In the Mar Shee case, the court (p. 9) said: '. . . we deduced that a fact is proved as against a party when it is established by the uncontradicted testimony of the party himself or of his witnesses, under circumstances which afford no indication that the testimony is the product of mistake or inadvertence; and that when the fact so proved is wholly irreconcilable with the presumption sought to be invoked, the latter is dispelled and disappears from the case.' '' (See also *Russell* v. *Andersen*, 101 Cal.App.2d 684 [226 P.2d 350].)

Applying the principles enunciated in the cases hereinbefore cited, we conclude that in view of the fact that respondent was unable to testify by reason of loss of memory and that his acts and conduct at the time of the accident

must be testified to by other witnesses the test given in the Westberg and Mar Shee cases is proper. Although the witness Chandler testified to a number of facts concerning the accident, yet he could not and did not purport to state the happening of the accident from the viewpoint of plaintiff. In other words, he could not review the events as seen through plaintiff's eyes. For aught that appears, factors might have been present and might have motivated plaintiff's conduct other than were testified to by Chandler. Therefore the court did not err in instructing the jury that the law presumes that respondent at the time of and immediately preceding the accident was exercising ordinary care for his own safety.

This presumption was a form of prima facie evidence, and it was for the jury to weigh all of the evidence in the case, including the presumption, and to determine if the presumption had been overcome. We cannot say as a matter of law that the implied finding of the jury that respondent was not guilty of contributory negligence is without support in the record.

 Appellant contends further that respondent assumed the risk as a matter of law. The court instructed the jury fully and correctly on the doctrine of assumption of risk and pointed out that a person who with knowledge and appreciation of the risk voluntarily exposes himself to the danger is not entitled to recover damages which resulted from the dangerous condition to which he exposed himself. The court also told the jury that:

"In determining whether or not a person had knowledge of a dangerous situation and whether, with such knowledge, he assented to or assumed a risk so as to bar recovery by him of damages for injury, you may consider his age, experience and capacity along with all the other surrounding circumstances as shown by the evidence.

"You are instructed that the doctrine of assumption of risk is not applicable in favor of a defendant if you should find that the defendant has violated an applicable statute or safety order which was made for the protection of human life and that such violation was the proximate cause of the accident."

 In the instant case there was evidence from which it could be inferred that appellant violated a safety order of the Division of Industrial Safety, and if the jury reached that conclusion, the defense of assumption of risk could not

be sustained for as stated in *Maia* v. *Security Lumber & Concrete Co.*, 160 Cal.App.2d 16, at page 20 [324 P.2d 657] :

"The defenses of contributory negligence and assumption of risk are separate and distinct defenses. While the defense of contributory negligence was available to defendant, the same cannot be said as regards the doctrine of the assumption of risk. It is 'elementary law' said the court in the Atherley case, that ' "in cases of violation of a safety regulation the defendant cannot defend on the ground that the plaintiff for whose protection the regulation was passed assumed the risk." ' (*Mula* v. *Meyer*, 132 Cal.App.2d 279 [282 P.2d 107] ; *Finnegan* v. *Royal Realty Co.*, 35 Cal.2d 409 [218 P.2d 17].) . . ."

Appellant contends also that the court erred in reading section 2603 of the Electrical Safety Orders of the Division of Industrial Safety (Cal. Admin. Code, tit. 8, § 2603) to the jury and in instructing the jury that it was applicable to the general field involved in the instant case. This order dealing with work near high-tension wires is for the purpose of safeguarding employees against accidental contact with the lines. It forbids permitting an employee to work near the lines unless certain precautions have been taken, and these include the deenergizing of the lines or the erection of mechanical safety barriers. Appellant contends that the Division of Industrial Safety does not have jurisdiction over overhead line construction such as was involved in this case and that exclusive jurisdiction over the safety of employees was expressly granted to the Public Utilities Commission. Section 8037 of the Public Utilities Code provides that the commission may make such further additions or changes as it deems necessary in electrical line construction for the purpose of safety to employees and the general public. In accordance with the authority granted, the Public Utilities Commission promulgated what is now known as General Order Number 95 which contains specific rules for the construction of overhead electric lines. The preface of the order states that the revision of the predecessor order was necessary to bring about the necessary provisions that practice had shown to be desirable for the safety of workman and the public in general.

Section 6800 of the Labor Code states: "The division [Division of Industrial Safety] has jurisdiction over:

. . . . . . . . . . . . . .

"(c) The safety of employees of all other public utilities as defined in the Public Utilities Act."

Section 6801 of the Labor Code states: "The jurisdiction vested in the division shall in no instance, except those affecting exclusively the safety of employees, impair, diminish, or in any way affect the jurisdiction of the Public Utilities Commission over the construction, reconstruction, replacement, maintenance, or operation of the properties of public utilities or over any matter affecting the relationship between public utilities and their customers or the public."

Section 6802 of the Labor Code permits the Public Utilities Commission to suspend, modify or annul safety orders of the Division of Industrial Safety.

We are of the opinion that the Division of Industrial Safety has jurisdiction over the safety of employees of public utilities though that jurisdiction may be controlled. In the instant case the record does not disclose that the Public Utilities Commission revoked or altered any safety order. Nor in the instant case is there any conflict between section 2603 and General Order Number 95. All that the safety order does is to set forth additional safeguards which every employer must follow. The appellant, if an employer, would be subject to the safety order, and its failure to follow the safety order would be negligence.

Appellant contends, however, that the safety order was not applicable to the facts of this case because by its own terms it does not apply to "authorized and qualified employees of any person, firm, or corporation engaged in the construction, reconstruction, operation, and maintenance of . . . electrical . . . communication systems." (Cal. Admin. Code, tit. 8, § 2603, subd. (e).) A qualified person is defined as "One familiar with the construction and operation of the apparatus and the hazards involved."

Respondent contends that whether or not respondent was a qualified employee was a question of fact for the jury to determine. Respondent points to the evidence that he was at the time of the accident 19 years of age; that he had attended grammar school only; that he had not received any formal electrical training; that he had worked repairing lines, installing poles and installing lines for the Evans Telephone Company approximately 18 months at the time of the accident; that he had installed lines on joint poles; and that he had never been given any safety memoranda. We do not

believe that it can be held that as a matter of law respondent was a qualified employee.

■■■■■ Appellant also contends that it was error to read the safety order because it did not owe respondent a safe place of employment since it was not an employer within the meaning of the safety order. Section 6304 of the Labor Code provides in part that the term ''employer'' shall also include every person having direction, management, control or custody of any employment, place of employment or any employee. The statute gives an extremely broad definition of the term.

In the recent case of *Johnson* v. *A. Schilling & Co.*, 170 Cal. App.2d 318 [339 P.2d 139] (hearing denied), the court said at page 322:

''Section 6302, Labor Code, defines 'place of employment' as 'any place, and the premises appurtenant thereto, where employment is carried on . . .' (Section 6304 reads: ' ''Employer'' shall have the same meaning as in section 3300 and shall also include every person having direction, management, control, or custody of any employment, *place of employment*, or any employee.' (Emphasis ours.) This definition is obviously intended to enlarge the meaning of 'employer' beyond its usual meaning for the purposes of Division 5 of the Labor Code in which it is found and which deals specifically with 'Safety In Employment.' ■■■■■ Where an owner of real property contracts to have work done on his property such property becomes a place 'where employment is carried on' and hence a place of employment under the definition of section 6302. Since the owner has 'custody and control' of his own property, he then has custody and control of a 'place of employment' and hence is an 'employer' within the definition of section 6304. This was the specific holding of the court in *Maia* v. *Security Lumber & Concrete Co.*, 160 Cal.App.2d 16 [324 P.2d 657]. In that case a safety order adopted pursuant to the authority of division 5 of the Labor Code required a safety control to be locked in the 'off' position or the machine to be disconnected from its source of power, and certain cautionary signs to be placed thereon, whenever any repairs were being made on a power driven machine. While such a machine was being repaired by the employee of a contractor with the owner the machine was started resulting in injury to the contractor's employee. The trial court instructed that this safety order applied only to the contractor and not to the owner unless the jury found that the repair work was under-

taken by the employee of the owner as well as the contractor's employee. Following a defendant's verdict the District Court of Appeal reversed for error in this instruction holding that within the meaning of section 6304 the landowner was an employer and the jury should have been instructed that the duty of carrying out the safety order rested on it as well as on the contractor. (160 Cal.App.2d p. 20.) A hearing was denied by the Supreme Court.''

We believe that a proper construction of said section 6304 is that it intended to enlarge the meaning of the word ''employer'' beyond its usual meaning in cases involving the safety of employment. (*Johnson* v. *A. Schilling & Co., supra.*) If the owner of the property has created a dangerous condition, he is an employer to a person rightfully engaged in the performance of his employment on or about the property where the dangerous condition was created even though the person is actually the employee of another. (*Johnson* v. *A. Schilling & Co., supra.*) We are therefore of the opinion that the court did not commit error in reading the safety order to the jury.

Appellant contends also that the trial court erred in instructing the jury:

''. . . . . . . . . . . . . .

''No . . . person, firm or corporation shall—

''(f) . . . Run, place, erect or maintain vertically on any pole any wire or cable used to conduct or carry electricity, without causing such wire or cable to be at all times wholly incased in a casing equal in durability and insulating efficiency to a wooden casing not less than one and one-half inches thick . . .''

The instruction was in the language of Act 2284, section 1, of Deering's General Laws. (It has now been codified and it is now Pub. Util. Code, § 8031.) Appellant contends that the instruction was improper because the matter is covered by General Order Number 95 pursuant to the authority granted the commission by section 8 of the Act. (Now Pub. Util. Code, § 8037.) Appellant contends that section 54.4-D9 of General Order Number 95 is such a change. This rule states that ''Unprotected lateral and vertical conductors . . . shall not be attached to the surface of poles, but shall be supported on crossarms. . . . In lieu of the foregoing, lateral and vertical conductors may be installed on the surface of poles provided the conductors are suitably insulated and protected as specified in Rule 54.6.'' There is no conflict

between rule 54.4-D9 and section 1 of Act 2284. The latter relates the rule for the construction of unprotected lateral and vertical conductors. The former states that vertical wires on poles shall be insulated.

■ Appellant also contends that it was improper for the trial court to instruct the jury that the appellant had the duty to take the necessary measures to eliminate the inductive interference on the telephone line because of the duty imposed on it by rule VI of General Order Number 52 of the Railroad Commission of the State of California (Public Utilities Commission), which reads in part: "If any case of inductive interference, not otherwise covered by these rules, shall be experienced or become imminent, such as interference . . . in subscribers' metallic telephone circuits, the parties concerned shall endeavor to agree upon a procedure for the prevention or mitigation of the interference by applying remedial measures. . . ."

Appellant contends this rule only applies to metallicized circuits because of the example given. This would unduly narrow the opening words of the rule. We do not think that the examples are exclusive. We believe the rule covers any case of inductive interference and that the instruction was proper.

■ Appellant also contends that the trial court erred in instructing the jury to the effect that if a public utility shall do, or cause to be done, or permit to be done an act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do anything it is required to do by law, it shall be liable to those affected by it. Appellant argues that the jury could find it guilty for the simple reason "it permitted" the respondent to bring the telephone wire in contact with the energized wire. This is unrealistic. We think that the jury understood the instruction to mean that if appellant violated a safety order, a general order or statute it could be liable to the respondent.

■ Appellant also contends that it was error to sustain an objection to the following question asked of respondent's expert, Hagler: "Now, tell me, in your District, in the state buildings and areas under your jurisdiction there, do you have on any of your pole structures, your distribution systems, any unprotected vertical conductors?" The apparent purpose of the question was to show the interpretation placed on General Order Number 95 by the state. This purpose was not clearly stated to the trial court. It was irrelevant what the state

may have understood if in fact the wire was a vertical run. The thing that was being tested was the witness's opinion, not how the state systems were constructed.

The instant case presented difficult questions of law and fact. We believe that the court fully and correctly instructed the jury on the law as to the issues of negligence, contributory negligence, assumption of risk and as to the applicable statutes.

We believe that issues of fact as to negligence, contributory negligence and assumption of risk were properly submitted to the jury and that the jury's determination of those issues in favor of respondent is supported by the evidence and the law.

The judgment is affirmed.

Peek, J., concurred.

VAN DYKE, P. J.—I dissent. The major issue involved in the trial was whether or not the Pacific Gas and Electric Company violated certain provisions of Public Utilities Commission General Order Number 95 by the manner in which it had constructed the transposition jumper with which the telephone line came in contact. The manner of the construction of the transposition jumper was not in dispute. Its form, shape, composition and position were clear from numerous photographs, from diagrams and from the testimony. The transposition jumper was not insulated and there was undisputed testimony that had it been insulated respondent would not have suffered injury when the telephone line came in contact with it. Respondent contended throughout the trial that the general order required the jumper wire to be insulated. Appellant contended to the contrary.

General Order Number 95 contains the rules for overhead electric line construction. The order is the product of many years of study. After its first promulgation, practical experience in the application of it was followed by further study and some changes were made. The general order has the force and effect of a statute (*Viner* v. *Civil Service Com.*, 59 Cal.App.2d 458, 465 [139 P.2d 88]; *Lertora* v. *Riley*, 6 Cal.2d 171 [57 P.2d 140]; *Snyder* v. *Southern Calif. Edison Co.*, 44 Cal.2d 793 [285 P.2d 912]), and generally the same principles govern the construction of such a regulation as govern the interpretation of statutes. (2 Cal.Jur.2d, Administrative Law, § 82, p. 164.) The rules are not so clear that a single

meaning can certainly be found by a mere reading. It follows that the construction of General Order Number 95 was a matter for the court; and since the facts were undisputed, the applicability of the order was equally a matter of law. (*Estate of Madison,* 26 Cal.2d 453, 456 [159 P.2d 630].) A significant application of these rules is found in *Bodinson Mfg. Co.* v. *California Emp. Com.,* 17 Cal.2d 321 [109 P.2d 935]. There the statute under consideration provided that an employee should not be eligible for benefits under the unemployment law if "he left his work because of a trade dispute." The applicants for benefits had absented themselves from work because the members of a union not their own were on strike against the common employer. The commission had interpreted the law as meaning that the absence from work must be voluntary and that in view of the trade dispute the refusal of the applicants to cross the picket lines of the striking union was not voluntary. Said the court, at pages 324, 326:

"The main issue is one of statutory interpretation. It is necessary to determine the meaning of the legislative declaration that a workman is disqualified if he left his work because of a trade dispute. . . .

. . . . . . . . . . . . .

". . . The ultimate interpretation of a statute is an exercise of the judicial power. . . . The judicial power is conferred upon the courts by the Constitution and, in the absence of a constitutional provision, cannot be exercised by any other body."

Notwithstanding the administrative interpretation resulting in findings by the commission the court in that case said such findings made "no pretense at finality" and that "it is the duty of this court, when such a question of law is properly presented, to state the true meaning of the statute finally and conclusively, even though this requires the overthrow of an earlier erroneous administrative construction."

We have here a situation where the trial court was required to determine as a matter of law whether the governing law had been violated. This action was requested and refused, the court taking the position that it was for the jury to decide the issue. Finally, appellant requested instructions which would have adopted appellant's contentions that there had been no violation and the court refused to give them.

At the request of respondent the court instructed the jury that various provisions of the general order were in force

and effect at the time of the accident to the respondent, which provisions were read to the jury. The trial court told the jurors they were to determine from the evidence "which of these statutes, orders, rules and definitions are applicable in this case" and that they were to "apply only those which" the jury found applicable. The court told the jury that the Public Utilities Commission had promulgated its General Order Number 95 with the purpose of formulating uniform requirements for overhead electrical line construction for the purpose of insuring adequate service and of securing safety to persons engaged in the construction, maintenance, operation and use of overhead electrical lines; that the Public Utilities Act required that every public utility should obey every requirement of every order, rule or regulation prescribed by the commission and that if a public utility failed to do so it should be liable to any person affected thereby for all loss, damages or injuries resulting from such failure.

The court said: "I am going to read to you certain statutes and official orders and rules of regulatory bodies of the State of California, and certain definitions contained therein. All these are applicable to the general field involved in this case, or some aspect of it. But whether or not a particular statute, order, rule or definition is applicable to the facts in this case, depends in some instances at least, upon what you find the facts to be. In other words, you must determine, after hearing all the evidence, which of these statutes, orders, rules and definitions are applicable in this case; and you will apply only those which you do find applicable." It is clear that the court left to the jury both the interpretation of the law and the application thereof. This was error.

Respondent contended throughout the trial and reiterated the contention in argument to the jury that the transposition jumper wire came within the definition of a vertical run as that term was used in the orders, that therefore the law required that it be insulated, which it was not, and that this violation of the orders convicted appellant of negligence as a matter of law. On the contrary, appellant contended throughout that the transposition jumper was not a vertical run as that term is used in the orders, that therefore it was not required to be insulated and that there had been no violation of any part of the general order of the commission. The trial court had before it the general order and also the opinions of four persons who were thoroughly familiar with

overhead line construction as practiced in the field, some of whom had been directly engaged in the formulation of the general order and in its later revision. Three of them were of the opinion the jumper wire was properly installed. One said it was not. Although their opinions as to the proper interpretation of the term "vertical runs" as used in the orders was given in the form of expert testimony, it obviously cannot be classified as evidence since it is addressed to a question of law which the court had to resolve. No objection was made by either side to this method of bringing to the court the aid of these men. But after their opinions and their reasons therefor had been received, the court failed to perform its judicial function of interpreting the applicable provisions of the general order and, in the light of the undisputed facts, declaring that there had, or had not, been a violation of law by leaving the jumper wire uninsulated. This necessitates a reversal of the judgment.

Since the interpretation and application of the general order provisions governing the installation of the jumper wire were questions of law for the trial court they are likewise questions of law now presented to this court. My study of the orders and the record leads me to the conviction that there was no violation, that the law did not require the jumper to be insulated. In short, I believe the experts presented by the appellant correctly construed the law. I would reverse the judgment.

A petition for a rehearing was denied July 6, 1960. Van Dyke, P. J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied August 3, 1960. Schauer, J., was of the opinion that the petition should be granted.