[Civ. No. 19075. First Dist., Div. One. May 12, 1961.]

VIRGINIA STODDARD, as Executrix, etc., et al., Plaintiffs and Appellants, v. RICHARD S. RHEEM et al., Defendants and Appellants.

Cruikshank & Gershon and Harry L. Gershon for Plaintiffs and Appellants.

Hauerken, St. Clair & Viadro and Hauerken, St. Clair, Zappettini & Hines for Defendants and Appellants.

WOOD (Fred B.), J. pro tem.*—This is an action for damages brought by the widow and children of John Stoddard whose death was allegedly caused by the negligence of the defendants in the operation of a gas-producing well. Verdict and judgment were rendered in favor of the plaintiffs in the sum of $90,000. Upon motion of the defendants the trial court made an order for a new trial. Plaintiffs have appealed from that order. Defendants have appealed from the judgment.

### THE ORDER GRANTING A NEW TRIAL

The new trial was granted upon the theory that it was an "error in law" (Code Civ. Proc., § 657, subd. 7) to give a certain proper instruction in the manner in which it was given.

Decedent lost consciousness at the time of the injury and never regained control of his faculties. Accordingly, plaintiffs were entitled to an instruction that under such circumstances there is a disputable presumption that the decedent was exercising due care at the time of and immediately preceding the accident. The court inadvertently omitted such an instruction. As soon as the jury had left the courtroom, plaintiffs' counsel brought this omission to the attention of defense counsel who suggested they inform the judge. This they did. The judge proposed that they go to the jury room and give the instruction. Upon arrival (within 10 minutes of the time the jury had left the courtroom) the following proceedings occurred:

"THE COURT: Let the record show that the jurors, counsel and Court are all present, and it has been stipulated we might come in regarding this instruction.

"MR. GERSHON [Counsel for Plaintiffs]: Yes.

"MR. ST. CLAIR [Counsel for Defendants]: Yes.

"THE COURT: Ladies and gentlemen, in reading these instructions this morning, I have to apologize because one of the instructions apparently was stuck to one of the others and was not read by me, and it is an instruction that is always given in cases where a death occurs immediately or that the person who has been injured never recovers consciousness, or someone who by reason of an accident is rendered unconscious and who has forgotten everything which happened.

---

*Assigned by Chairman of Judicial Council.

"It is this instruction: . . . [Text of Instruction]. . .

"Pardon this interruption. I thank you.

(Whereupon, the Court, counsel and the reporter left the jury room and the jurors continued their deliberations.)"

The parties are agreed that the instruction was correct and proper and should have been given. Defendants claim it was an "error in law" to give it thus separately after the giving of all the other instructions. This manner of giving it, they say, gave undue emphasis to the presumption, overly impressed it upon the minds of the jury.

We cannot say as a matter of law that such was the case. Defendants stipulated that the instruction be given in the jury room. That cured any potential error based upon the place where given. The explanatory remarks of the judge were not calculated to focus undue attention upon the subject-matter of the instruction. Those remarks, coupled with a cautionary instruction earlier given, ". . . not to select a single instruction, or a portion of any instruction alone, but to consider all of the instructions in determining any issue in this case . . ." tended to counteract any element of over-emphasis which might otherwise have stemmed from the delayed and separate treatment of the subject of this instruction. If the defendants felt that additional cautionary instructions were desirable or that all of the other instructions on negligence and related topics should be given again, along with the previously omitted instruction, they should have made timely request therefor. They should not be permitted to stand silently by, giving the appearance of acquiescence, if not participation, in the manner in which this instruction was given, and be later heard to complain, too late for curative measures to be taken. This comes within the purview of the principle that ". . . when a request for more specific instructions . . . is not made by an appellant, and when the instructions given are accurate, error cannot be urged . . . [upon appeal] because of the failure of the trial court to give more specific or enlarged instructions." (*Sherrillo* v. *Stone & Webster Eng. Corp.*, 110 Cal.App.2d 785, 789-790 [244 P.2d 70]. See also *Jones* v. *Reagan*, 169 Cal.App.2d 635, 641 [337 P.2d 889]; *Whitford* v. *Pacific Gas & Elec. Co.*, 136 Cal. App.2d 697, 702-703 [289 P.2d 278]; *Hopkins* v. *Tye*, 174 Cal.App.2d 431, 433 [344 P.2d 640].) Had defendants made a timely request for additional cautionary instructions or for a rereading of all the other pertinent instructions the trial court would have had an opportunity to consider the matter

and, to the extent deemed proper, doubtless would have complied with the request. Had the request been made and the court refused, there might then have been presented a question whether "an error in law" had occurred at the trial.

In the absence of such a request, under the circumstances of this case, we do not find a basis for holding that the giving of the instruction in question, at the time and in the manner in which given, constituted an "error in law." The question is essentially the same whether it arise upon appeal from an order for new trial or upon appeal from a judgment. In either case the question is whether or not the challenged incident was an "error in law" at the time it occurred.

In deciding this question there is no element of discretion involved. That element comes into play if, and only if, it is first determined that an error in law has occurred. In such event the provisions of section 4½ of article VI of the state Constitution come into operation. They declare, so far as pertinent here, that no new trial shall be granted ". . . on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." On this issue, as in the case of any factual question, there is every intendment in favor of the trial court's decision. That decision will be sustained if it finds support in the evidence. But in our case we have not reached such a question. We are concerned with a pure question of law and have found that there was no legal error.

Significantly, the Supreme Court says that "when no error has been committed, there is no basis for the exercise of discretion" (*Parker* v. *Womack*, 37 Cal.2d 116, 123 [230 P.2d 823]) and that "where . . . the instructions are correct, there is no basis for the exercise of discretion, and no legal ground, in that respect, on which a new trial may be granted. . . . The inquiry as to whether instructions are erroneous presents purely a question of law . . . and if it appears on appeal that a trial court in granting a new trial based its order exclusively upon an erroneous concept of legal principles applicable to the cause, its order will be reversed . . ." (*Connor* v. *Southern Pacific Co.*, 38 Cal.2d 633, 637 [241 P.2d 535]); followed in *Rosenberg* v. *Wittenborn*, 178 Cal.App.2d 846, 850 [3 Cal.Rptr. 459], the court saying that ". . . the customary discretion of the trial judge

upon motion for new trial does not extend to granting the motion upon the ground of error which does not actually exist; that question is strictly one of law and the ruling is to be appraised accordingly.''

 The absence of error in our case is emphasized by the fact that it would have been reversible error if the court had refused to read the instruction in question. This is demonstrated by the facts and the decision in *Davis* v. *Erickson,* 53 Cal.2d 860 [350 P.2d 535]. There the jury requested the court to read again the instructions on negligence and assumption of risk. In so doing, the court inadvertently omitted three instructions which had been requested by appellant and given by the court. After the jury retired appellant called this omission to the attention of the court. Respondent objected, contending that the omitted instructions, if now again given, would be unduly emphasized as to their importance. The trial court agreed and refused to give them. The Supreme Court found that the omission of one, at least, of these three instructions was prejudicially erroneous; also that the jury's request for the rereading was proper; that the trial court properly attempted to comply; and that the refusal to reread the omitted instruction was as erroneous, under the circumstances, as would have been a refusal to give it in the first instance. ''The argument that to recall the jury to read the omitted instructions would have overemphasized their contents is not persuasive. The court could have admonished the jury not to attach any particular emphasis to the fact that it was reading certain instructions which had been inadvertently omitted in its first reading, thereby protecting respondents from any prejudice in the court's correcting its previous oversight (*Greitz* v. *Sivachenko,* 143 Cal.App.2d 146, 150 [299 P.2d 374]) or the court could have avoided any appearance of emphasis by rereading all of the instructions on the subject including the instructions previously omitted by inadvertence.'' (P. 864.)

### The Appeal from the Judgment

 Defendants claim there is insufficient evidence of negligent conduct on their part which was a proximate cause of the accident.

The gas well here involved, owned by the defendants Rheem and operated under the supervision of their employee, defendant Hamilton, had been in operation about two years but recently had become increasingly subject to salt water seepage

which at first impeded and later prevented further production of gas. The owners purchased a plunger lift from the National Supply Company and contracted with the latter for its installation. National Supply sent its employee John Stoddard to do the installing.

The principal features of this well prior to installation of the plunger consisted of a vertical tube extending from the gas-bearing strata upward to a head the top of which was about 3 feet above ground level. A manually operated master gate or valve just below the head could be used to cut off or to permit the upward flow of gas. From the head a tube known as the sales line led off to the south for about 10 feet and thence easterly to the customer's transmission lines. It was about 2½ feet above ground level. There was a manually operated wing gate or valve in the sales line, close to the head, that could be used to cut off or to permit the flow of gas in the sales line. Immediately to the south of the wing gate, in the sales line, there was a motor valve which by opening and closing similarly controlled the flow of gas in the sales line. This assembly of gates and valves at and near the head of the well was known as "the Christmas tree" and was situate atop an open concrete lined pit or cellar about seven feet square and four feet deep. In the sales line, some 30 feet south and east of the Christmas tree, there was a manually operated release valve which when open allowed the gas to escape into the atmosphere.

In normal operation, with master and wing gates and motor valve open and release valve closed, the gas would flow upward under a pressure of 1,500 pounds per square inch, and from the head into the sales line at a pressure of 750 pounds per square inch.

The equipment installed by Stoddard consisted of the plunger, a steel piston weighing about 18 pounds and fitting snugly inside the well tubing but freely movable up and down; a foot-piece inserted at the bottom of the well to catch the falling plunger; a bumper housing, a hollow cylinder about 40 inches high, with removable metal cap, installed on the top of the well head to catch and hold the plunger as it rises from the well tubing; and a timer designed to open and close the motor valve in the sales line upon cycles of operation and shut-off at such time intervals as will release the plunger and allow it to drop to the bottom when the infiltration of water has materially impeded the flow of gas from below.

After installing this equipment (except that he had not yet preset the timer, which would have to await observations to ascertain the appropriate time intervals; the timer would meanwhile open and shut at irregular intervals) Stoddard dropped the plunger into the well tubing and put the well into operation. The plunger fell by gravity through the accumulated fluids and stayed there. Nothing further happened. Normally, the gas entering the tube at the bottom of the well would propel the plunger upward by the expansion of the entering gases. The plunger in its upward passage would force the fluids ahead of it and out through a separator near the top and continue upward until reaching the top of the capped housing. The plunger is then held in position by the pressure of the gas which flows outward to the sales line through an opening in the head below the bumper housing. With the timer in cycle operation the plunger would remain in this uppermost position for the predetermined time interval, at the end of which the timer would close the motor valve, shutting in the well, cutting off the gas pressure and allowing the plunger to drop to the bottom and then repeat the process.

But in this instance the plunger did not rise. It stayed at the bottom. So, Stoddard decided to "blow out" the well. The gas in the sales line exerted a pressure of 750 pounds per square inch against the gas coming from the well. By opening to the atmosphere the release valve in the sales line, the 750 pounds would reduce to atmospheric pressure and thus allow nearly all of the 1,500 pounds to be utilized in lifting the plunger. The much heavier surge of gas would likely free the plunger and force it upward.

To accomplish this, the "release" valve was opened. Then Stoddard opened the master gate, the wing gate and the motor valve. Hamilton walked away some distance, to escape the noise of the gas emitted through the release valve. After 5 or 10 minutes, the noise of the escaping gas having died down, Hamilton walked back toward the well, passing the release valve enroute. Stoddard told Hamilton the plunger had come up and he had shut off the master gate to trap the plunger. Stoddard then stepped up onto the sales line, uncapped the bumper housing and removed the plunger, first opening the "bleeder" on the top of the housing, to bleed out any gas that might be in the bumper housing. He then pulled out the plunger. Stoddard examined the plunger and started to lower it into the bumper housing. He was either standing on the sales line or sitting on the motor valve at the time.

As Stoddard lowered the plunger into the housing, it almost immediately flew up and out, hitting him a glancing blow in the front of the forehead and knocking him to the floor of the cellar. He fell into the cellar face up, striking his head on the concrete edge of the cellar as he fell.

There is substantial evidence to support an implied finding that the rush of gas which ejected the plunger from the bumper housing came from the sales line upon the opening of the motor valve by the timer, following a premature closing of the release valve by defendant Hamilton.

The closing of the master gate in order to trap and extract the plunger, cut off the flow of gas from below. There was evidence that the master gate remained closed. That left the sales line as the only source of gas for ejection of the plunger. There was expert testimony that the wing gate and motor valve must have been open and the release valve closed for gas to escape from the sales line into the well head and out through the uncapped bumper housing. There was evidence that the release valve had been open until some time during Hamilton's walk away from the well, which was prompted by the noise of gas escaping through the release valve. Hamilton testified that that noise died down while he was out there, in the vicinity of the release valve. The jury could infer that Hamilton closed the release valve while out there. He testified that he and Stoddard were the only persons around and that Stoddard remained in close proximity to the Christmas tree, some 30 feet distant from the manually operated release valve, which latter was thus accessible to Hamilton and not to Stoddard. The jury could additionally infer that the closing took place in an interval during which the motor valve was closed by the timer, for there was no immediate rush of gas through and out the uncapped bumper housing. A rush of gas did occur a little later, presumably upon the reopening of the motor valve by the timer. There is ample evidence that a premature closing would be negligent, including Hamilton's testimony that the release valve should have been open, not closed.

Defendants say this is dealing in pure speculation. We do not so view it. It is simply a case of competent evidence of various facts from which reasonable inferences could be drawn, leading to the implied findings which the verdict indicates the jury made. ▇▇▇ ''In determining whether the evidence is sufficient we must, of course, view it in the light most favorable to . . .'' the prevailing party. (*Rudolph* v.

*Tubbs,* 46 Cal.2d 55, 56 [291 P.2d 913].) [■ All "... conflicts in the evidence must be resolved, and all reasonable inferences must be conceded, in favor of the judgment of the trial court." (*Johnson* v. *Griffith,* 19 Cal.2d 176, 179 [120 P.2d 6].)

■ There was evidence also that there was no cover or platform over the cellar on the day of the accident nor for some time prior thereto. The jury could have found that the absence of planking rendered this an unsafe place of employment. The jury could have further found that the failure to provide such covering was a negligent act of defendants Rheem, owners and operators of this well, in violation of duties cast upon them in favor of decedent Stoddard by the provisions of sections 6400 and 6401 of the Labor Code. These sections require every employer to provide a safe place of employment and to furnish and use safety devices and safeguards to render places of employment safe and to do everything necessary to protect the life and safety of employees.*

These are duties which, in view of the broad definitions of "employer," "employee" and related terms in sections 6302 to 6305 of the Labor Code, the defendants Rheem, as owners and operators of the well, owed to Stoddard while engaged in his work of installation at this well. (*Atherley* v. *MacDonald, Young & Nelson,* 142 Cal.App.2d 575, 580-583 [298 P.2d 700], contractor or building owner and employee of subcontractor; *Bragg* v. *Mobilhome Co.,* 145 Cal.App.2d 326, 329-332 [302 P.2d 424], builder and a subcontractor who was performing the work of an employee; *Maia* v. *Security Lumber & Concrete Co.,* 160 Cal.App.2d 16, 19-20 [324 P.2d 657], landowner and employee of contractor; *Johnson* v. *A. Schilling & Co.,* 170 Cal.App.2d 318, 322-324 [339 P.2d 139], landowner and employee of contractor; *Williams* v. *Pacific Gas & Elec. Co.,* 181 Cal.App.2d 691, 708-709 [5 Cal.Rptr. 585], landowner and employee of contractor.)

Defendants claimed the presence or absence of a platform for Stoddard to stand on while at work was irrelevant, adducing testimony which tended to show that with or without a platform at ground level he would have to climb up on the pipes and valves to reach the top of the uncapped bumper

---

*These code sections are implemented by Petroleum Safety Orders 6549 (subd. a) and 6576 (a) of title 8 of the California Administrative Code, prescribing certain safety requirements concerning cellars and open pits.

housing to put the plunger in. Even if that were so, such a platform might well have lessened the injury by saving Stoddard the hazard of a fall clear to the bottom of the cellar; also, the jury may have found that safety required an elevated platform, above ground level. Moreover, plaintiffs adduced testimony that a man of Stoddard's height (5 feet, 9 inches) could have returned the plunger to the bumper housing by standing on planks at ground level, if there had been planks in place. We cannot say that this testimony was impossible of belief. We do not know how high the jury found Stoddard would have had to lift the plunger to effect its return. Some of the evidence indicates it may have been about 5 feet 10 inches above ground level; some, about 6 feet 4 inches; some, about 7 feet; and some, somewhat higher.

The order for new trial is reversed and the judgment affirmed.

Tobriner, Acting P. J., and Duniway, J., concurred.

The petition of defendants and appellants for a hearing by the Supreme Court was denied July 5, 1961. Schauer, J., was of the opinion that the petition should be granted.